# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 14, 2004     Decided December 10, 2004

No. 03-3149

UNITED STATES OF AMERICA,
APPELLEE

v.

JAKE WEST,
APPELLANT

———

Consolidated with
No. 03-3150

———

Appeals from the United States District Court
for the District of Columbia
(No. 01cr00292-01)
(No. 02cr00218-02)

———

*Jack R. Ormes* argued the cause and filed the briefs for appellant. *Phillis Payne* entered an appearance.

*Suzanne Grealy Curt*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Kenneth L. Wainstein*, U.S. Attorney, and *John R. Fisher*, *Roy W. McLeese, III*, and *Steven W. Pelak*, Assistant U.S. Attorneys. *Thomas J. Tourish, Jr.*, Assistant U.S. Attorney, entered an appearance.

Before: GINSBURG, *Chief Judge*, and HENDERSON and ROBERTS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROBERTS.

ROBERTS, *Circuit Judge*: Appellant Jake West pled guilty to two charges related to the embezzlement of funds from a union pension fund. He later asked the district court to allow him to withdraw his plea; the court refused. West now urges us to reverse that ruling, and also presents several challenges to his sentence. We find that the district court did not abuse its discretion in denying West's motion to withdraw his plea. With regard to the sentence, we decide that under the plea agreement West has waived the right to appeal. Since he offers no reasons why we should not treat the waiver as valid, we honor it and uphold the sentence.

## I.

Jake West is the former president of the International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers (IWU). In December 2001, the government charged him in a 51-count indictment with conspiracy, embezzlement from the IWU, making false statements in Department of Labor (DOL) reports, and obstruction of justice. The indictment alleged that West had appropriated union funds for his personal benefit and had covered up his activities by filing false and misleading reports with the DOL. A second indictment, filed in August 2002, charged both West and a former IWU General Secretary, LeRoy Worley, with conspiracy, embezzlement from the union, and embezzlement from the union's pension fund. According to the government, West arranged to have Worley paid a full pension from the IWU's retirement plan even though he did not meet the applicable

requirements; Worley, in exchange, dropped his bid to challenge West for presidency of the union.

Trial on the charges contained in the second indictment began with jury selection on October 15, 2002. Ten days later the jury was sworn, and West changed his mind about going to trial. He instead agreed to plead guilty to embezzlement from a pension fund, 18 U.S.C. § 664, and to one count of making a false statement in a DOL report, 29 U.S.C. § 439(b). In return, the government dismissed all remaining charges against him.[1]

The plea agreement that West signed includes an integration clause providing that "[t]he terms of this written Agreement constitute the entire plea offer and agreement in this matter." Appellee's Record Material (RM) at 7 (Plea Agreement). The agreement twice recites that no "promises, conditions, understandings, or agreements" have been made or entered into by the government other than those in the agreement itself. *Id*. at 8. The government "reserves allocution or its right to speak at Mr. West's sentencing," *id*. at 5, and the government and West "make no promises to one another and make no agreement with one another with regard to defendant West's sentencing in these matters," *id*. at 6. In addition, the agreement states that "West understands that his sentence will be imposed in accordance with the United States Sentencing Guidelines." *Id*. at 6. Finally, under the agreement West explicitly waives the right to appeal his sentence unless the court sentences him to a prison term in excess of the statutory maximum or departs upward beyond the Sentencing Guidelines range. *Id*. at 6–7.

---

[1] Worley proceeded to trial and, after a mistrial for a hung jury, reached an agreement with the government to have the charges dismissed in exchange for restitution.

The district court conducted a hearing to ensure that West was aware of the terms of the agreement and that he was entering his plea knowingly and voluntarily. West was represented at this hearing by counsel. With respect to the integration clause, the court asked West directly, "Other than the promises in this plea agreement, are there any other promises that have induced . . . you [to] plead guilty?" West responded, "no." Plea Hr'g Tr. at 20.

At the plea hearing, the government also proffered the factual basis for its charges against West. As trustee of the IWU's retirement plan, West was familiar with plan provisions setting out criteria for receiving benefits, including one that restricts normal pension benefits to persons 60 years of age or older. In December 1998, West arranged for Worley, who was younger than 60 at the time, to receive a normal pension. The apparent purpose of this maneuver was to persuade Worley to retire early and thus remove a rival in the next election for IWU president. By the government's calculation, Worley received $59,380 in excess pension benefits between December 1998 and November 1999.

As to the false statement count, the government's proffer states that in December 1997 West signed and declared true and correct a Form LM-2 Labor Organization Annual Report that was submitted to DOL. The LM-2 stated that disbursements to the IWU president, other than salary and expense allowance payments, totaled $8,556; the true figure, which West knew, was close to $98,500. Disbursements to Worley and three other IWU officials were also understated on the 1997 LM-2 by amounts ranging from $25,000 to $70,000. According to the proffer, the union's LM-2 filings for 1995 and 1996 also underreported the true amounts of disbursements to the president by "more than $70,000 and $80,000, respectively." Proffer of Facts at 6.

On August 19, 2003, as the date of West's sentencing approached, the probation office issued its final presentence investigation report. The report calculated West's sentence under the Sentencing Guidelines. It first assigned West a base offense level of four. Enhancements were then applied for several aspects of West's crimes: twelve points for the loss associated with his embezzlement, which exceeded $500,000, U.S.S.G. § 2B1.1 (1998); four points for being the organizer or leader of the embezzlement, § 3B1.1(a); two points for abusing a position of trust, § 3B1.3; two points for involvement in an offense of more than minimal planning, § 2B1.1(b)(4)(A); and two points for obstructing justice by providing false information to the grand jury, § 3C1.1. The total offense level was therefore 26. For criminal history category I, this yielded a sentence under the relevant Guidelines of 63 to 78 months. Because the statutory maximum for violations of 18 U.S.C. § 664 is five years and for violations of 29 U.S.C. § 439(b) one year, the longest sentence West could receive was 72 months.

The government filed its sentencing memorandum in late August 2003. The memorandum agreed with the presentence report "in all material aspects" and requested that West receive a sentence of 63 to 72 months in prison and be ordered to pay restitution. Sentencing Memorandum at 2. It also offered an extensive view of West's criminal activity. West was revealed as not an especially frugal union president. He spent, by the government's calculation, more than $51,000 in IWU funds on dinners, golf, and items for his home in Virginia. He allowed relatives to dine and go shopping in Washington, D.C., at the union's expense. He had the union pay for golf vacations in Palm Springs, California, for both his personal waiter and his tailor. These expenses went unreported in the union's LM-2 filings.

West also had other top officials pay his tabs so as to conceal the true amount of his own expenses. An opponent had used West's reported disbursements against him in the 1991 campaign for IWU president; West hoped to avoid a repeat of this by shifting reported expenses to lower-ranking officials. In many cases, these officials did not report these expenses at all and, according to the memorandum, were given license to spend the union's money freely themselves. The government argued that all these disbursements — both those unreported and those attributed to other officials — should be treated as relevant conduct for purposes of calculating West's sentence.

The memorandum made similar contentions with respect to West's deal with Worley. In addition to the $59,384 embezzled from the retirement plan, West arranged to have $74,620 improperly paid to Worley from the union's supplemental pension plan. At West's direction, Worley also continued to receive a salary and expense allowance from IWU — amounting to about $217,000 — for more than a year after his retirement. In all, the government calculated that conduct relevant to West's offense resulted in a loss of at least $555,000. It is also significant that, according to the government's memorandum, West collaborated in almost every aspect of these schemes with IWU General Counsel Victor Van Bourg.

On September 22, 2003, almost a year after entering his guilty plea, West moved the district court to allow his plea to be withdrawn or, alternatively, to order specific performance of the plea agreement. In the event the court was inclined to deny these requests, he asked that it hold an evidentiary hearing to consider the evidence against him. He advanced two arguments in support of the motion. First, he claimed that the prosecutor who negotiated the plea agreement had assured him that, in West's phrasing, "there would be no further reference" to the dropped charges. RM at 18 (West Declaration). As he saw it,

the government was now reneging on this promise by, in effect, re-introducing these charges at sentencing. Second, West argued that he did not know that his conduct as union president was illegal because he relied on attorney Van Bourg's assurances that — again, West's words — "all was proper and legal and that I had nothing to worry about." *Id*.

The district court denied West's motion. Applying our framework in *United States v. Hanson*, 339 F.3d 983 (D.C. Cir. 2003), the court ruled that West had not shown that his plea was tainted or presented a viable claim of innocence so as to warrant withdrawal. It also found that the government would suffer prejudice by having to reconstruct a complex criminal case that West's guilty plea cut short eleven months before. Finally, the court saw no reason to hold an evidentiary hearing or to order specific performance of the plea agreement.

The district court then proceeded to sentence West. West challenged four aspects of the presentence report's recommendations: the amount of loss, the four-point enhancement for his leadership role, the two-point increase for obstruction of justice, and the failure to deduct points for acceptance of responsibility. The court rejected all of West's claims. It found facts by the preponderance of the evidence that supported the application of the leadership and obstruction of justice enhancements. With respect to amount of loss, the court determined that the government had sufficiently proven that the loss caused by West's conduct was more than $500,000 but less than $800,000, entailing a 12-point enhancement. The government's calculations were established "through pleadings, through testimony, [and] through trial exhibits before the Court." Sentencing Hr'g Tr. at 39. West was also denied any reduction for acceptance of responsibility due to his last-minute attempt to withdraw his plea. Ultimately, however, the court departed downward from the Guidelines range because of

West's poor health. He was sentenced to 36 months in prison followed by two years' supervised release and ordered to pay approximately $185,000 in fines and restitution. West appeals.

## II.

West first challenges the district court's refusal to grant his motion to withdraw his plea. A defendant may withdraw a guilty plea before sentencing if he "can show a fair and just reason for requesting the withdrawal." FED. R. CRIM. P. 11(d)(2)(B). We look to three considerations in reviewing denials of motions to withdraw: "(1) whether the defendant has asserted a viable claim of innocence; (2) whether the delay between the guilty plea and the motion to withdraw has substantially prejudiced the government's ability to prosecute the case; and (3) whether the guilty plea was somehow tainted." *Hanson*, 339 F.3d at 988; *United States v. McCoy*, 215 F.3d 102, 106 (D.C. Cir. 2000). The last of these is the most important, *see United States v. Horne*, 987 F.2d 833, 837 (D.C. Cir. 1993), and usually requires a showing that the taking of the plea did not conform to the requirements of Federal Rule of Criminal Procedure 11. "[A] defendant who fails to show some error under Rule 11 has to shoulder an extremely heavy burden if he is ultimately to prevail." *United States v. Cray*, 47 F.3d 1203, 1208 (D.C. Cir. 1995). We review refusals of motions to withdraw for abuse of discretion. *United States v. Weaks*, No. 03–3048, slip op. at 4 (D.C. Cir. Nov. 12, 2004); *Hanson*, 339 F.3d at 988.

A. We begin then with the issue of taint. West contends that the government promised not to use any of the dismissed charges against him at sentencing and that its failure to carry out this promise taints his plea. Along with his motion in the district court, West submitted an affidavit stating that the prosecutor "assured me that there would be only the two counts and that the

others would be dismissed and that there would be no further reference to them." RM at 18 (West Declaration).[2]

As the district court recognized, the suggestion that such a promise was made is belied by the plea agreement itself, which could hardly be clearer on this point. It contains an integration clause that states: "The terms of this written Agreement constitute the entire plea offer and agreement in this matter." RM at 7 (Plea Agreement). It makes clear that "[o]ther than the offer and agreements noted in this document, there are no other promises, conditions, understandings, or agreements by Jake West or the [United States Attorney's Office (USAO)]." *Id*. at 8. Under the heading, "Defendant's Acceptance of Guilty Plea Agreement," where West signed the agreement, it again reads, "Absolutely no promises, agreements, understandings, or conditions have been made or entered into in connection with my decision to plead guilty except those set forth in this Guilty Plea Agreement." *Id*. What the agreement does say about West's sentencing is similarly unequivocal: "The USAO and defendant West make no promises to one another and make no agreement with one another with regard to defendant West's sentencing in these matters." *Id*. at 6. It also states that the government "reserves allocution or its right to speak at Mr. West's sentencing." *Id*. at 5.

---

2  Several months later, West submitted additional affidavits from his daughter and his attorney in support of a motion in the district court for bail pending appeal. We need not consider these affidavits because they were not part of the record before the court when it denied West's motion to withdraw his plea. *See* FED. R. APP. P. 10(a); *Kirshner v. Uniden Corp. of America*, 842 F.2d 1074, 1077 (9th Cir. 1988) ("Papers submitted to the district court *after* the ruling that is challenged on appeal should be stricken from the record on appeal."). Even if we were to consider them, they would not affect our disposition of West's appeal.

By itself, this language argues strongly against the existence of any unwritten promises by either party to the agreement. *See United States v. Ahn*, 231 F.3d 26, 36 (D.C. Cir. 2000); *United States v. Alegria*, 192 F.3d 179, 185 (1st Cir. 1999). Inferring such promises is virtually foreclosed where, as here, the district court has also conducted a flawless plea proceeding at which the defendant was made fully aware of, and assented to, the important terms of the agreement. *See Ahn*, 231 F.3d at 36. At the plea hearing, the court reviewed all the relevant aspects of the agreement with West, including the integration clause and the disclaimer of promises with regard to sentencing. West, represented by counsel at the hearing, was then asked whether any other promises induced him to plead guilty; he replied "no." If the government had made any unwritten promises to West about his sentence, this was the time for West (or his counsel) to say something. Neither did. In consequence, the district court did not abuse its discretion in deciding that West's plea was not tainted by any unwritten promise by the government.

B.	Having found no taint to West's plea, we next consider whether West presents a sufficiently viable claim of innocence to meet the "heavy burden" imposed by *Cray*. 47 F.3d at 1208. A general denial of guilt is not enough; West "must affirmatively advance an objectively reasonable argument that he is innocent." *Id*. at 1209. West argues that the district court erred in ruling that his reliance on Van Bourg, IWU's General Counsel, did not amount to a viable claim of innocence. West argues that "at all times" that he was involved in the acts for which he pled guilty "he was acting in accord with his attorney's advice." RM at 13 (Motion to Withdraw Plea). According to West, Van Bourg "consistently advised" him that all his actions were proper and that "no criminal liability could result." *Id*.

The district court gave two reasons for rejecting West's advice-of-counsel claim. First, it found that the defense was not applicable to 18 U.S.C. § 664, on the ground that the offense of embezzlement from a pension fund does not require that the defendant know that his conduct was illegal. Second, it ruled that the defense was inapplicable in any case because here Van Bourg was acting not as a legitimate attorney but as an accomplice, who would have been indicted along with West had he not died. The court made this finding by the preponderance of the evidence based on Van Bourg's untruthful responses to government subpoenas and on evidence that he pressured union accountants to cover up improper disbursements.

We agree that West does not present a viable claim of innocence because Van Bourg was properly deemed to have acted as his accomplice.[3] The defense of advice of counsel necessarily fails where counsel acts as an accomplice to the crime. *See United States v. Carr*, 740 F.2d 339, 347 (5th Cir. 1984) ("When the lawyer is a partner in a venture, takes a share of the profits, or is not a lawyer who had no interest save to give sound advice for a reasonable fee the advice of counsel defense is unavailable.") (internal quotation marks omitted).

The proffers included with the guilty pleas of other top union officials, as outlined in the government's sentencing memorandum, adequately show that Van Bourg was a co-participant in the embezzlement scheme. Van Bourg was integral to the decision to cover-up the true amount of disbursements to West in the union's LM-2 Reports. At a

---

[3] We therefore do not address whether the defense of advice of counsel would have applied had West's attorney not been deemed an accomplice. *See United States v. DeFries*, 129 F.3d 1293, 1308 (D.C. Cir. 1997) (good faith reliance on advice of counsel is a defense to the charge of embezzlement under 29 U.S.C. § 501(c)).

meeting between IWU officials and the union's accountants, Van Bourg indicated that he did not want to comply with LM-2 reporting requirements. He then asked the accountants what they would say if subpoenaed to testify about the meeting. When Van Bourg was told by the accountants that they would testify truthfully, he recommended that West fire them.

The evidence suggests that Van Bourg was also a participant in the arrangement to secure full pension benefits for Worley. Van Bourg had earlier advised local union agents, in the presence of West, that it was a crime to inflate pension benefits. West nevertheless states that Van Bourg "assured [West] that he could make it all legal." RM at 17 (West Declaration). A defendant may avail himself of an advice of counsel defense only where he makes a complete disclosure to counsel, seeks advice as to the legality of the contemplated action, is advised that the action is legal, and relies on that advice in good faith. *See SEC v. Savoy Industries*, 665 F.2d 1310, 1314 n.28 (D.C. Cir. 1981). Van Bourg's mere assurance that he could "make it all legal" falls well short of these requirements and, in light of the other evidence on which the district court relied, does nothing to undermine the conclusion that Van Bourg was himself part of the criminal enterprise. The district court was warranted in finding that Van Bourg acted as an accomplice and properly concluded that West could not present an advice-of-counsel defense. It was therefore no abuse of discretion for the district court to rule that West did not present a viable claim of innocence.

C. Finally, the district court placed some reliance on the possible prejudice the government would suffer if West were allowed to withdraw his plea. While prejudice may properly be taken into account, it "has never been dispositive in our cases." *Hanson*, 339 F.3d at 988; *see also Cray*, 47 F.3d at 1208. Although it certainly appears that the government would be

prejudiced here, we need not consider the matter further. West has not shown that his plea was tainted, nor has he satisfied *Cray*'s "heavy burden" by presenting a viable claim of innocence. These considerations suffice to decide that the district court did not abuse its discretion in refusing West's withdrawal motion. *See Cray*, 47 F.3d at 1208.[4]

## III.

The remainder of West's appeal involves several challenges to his sentence. He offers three reasons why his sentence should be vacated: (1) the district court relied on improper evidence in applying enhancements to his sentence under the Sentencing Guidelines; (2) the court did not give him an opportunity to cross-examine other union officials about the proffers submitted with their guilty pleas, in purported violation of his Sixth Amendment Confrontation Clause right; and (3) his sentence violated his Sixth Amendment right to a jury trial, as understood in *Blakely v. Washington*, 124 S. Ct. 2531 (2004), because it was based on facts that were neither admitted nor found by a jury beyond a reasonable doubt. Before we reach any of these arguments, however, we must first address whether West has waived the right to appeal his sentence.

---

[4] We are easily persuaded that the district court did not abuse its discretion in denying West an evidentiary hearing or the alternative relief of specific performance. A district court need hold an evidentiary hearing on a plea withdrawal only where the defendant offers "substantial evidence that impugns the validity of the plea." *United States v. Redig*, 27 F.3d 277, 280 (7th Cir. 1994) (internal quotation marks omitted). As explained, that was not the case here. With regard to specific performance, West does not allege any breach of the express terms of the plea agreement, and since the district court properly found no enforceable promise by the government regarding sentencing, such a promise obviously could not provide the basis for any form of relief.

The plea agreement between the government and West contains an explicit waiver of the right to appeal the sentence, which reads:

> Mr. West is aware that federal law, specifically 18 U.S.C. § 3742, affords him the right to appeal his sentence in these matters.  Knowing that, Mr. West waives the right to appeal his sentence or the manner in which it was determined pursuant to 18 U.S.C. § 3742, except to the extent that (a) the Court sentences Mr. West to a period of imprisonment longer than the statutory maximum or (b) the Court departs upward from the applicable Sentencing Guideline range pursuant to the provisions of U.S.S.G. § 5K2.

RM at 6–7 (Plea Agreement).[5]

The government asks us to give this waiver full effect.  It argues that we have enforced a similar waiver before, *see In re Sealed Case*, 283 F.3d 349, 355 (D.C. Cir. 2002), and that other circuits have honored such waivers in certain circumstances, *see, e.g.*, *United States v. Hahn*, 359 F.3d 1315, 1324–28 (10th Cir. 2004); *United States v. Hernandez*, 242 F.3d 110, 113 (2d Cir. 2001).  *Sealed Case* helps the government, but does not resolve the issue.  First, in *Sealed Case*, the defendant agreed, *after* he was tried and convicted, to waive the right to appeal that conviction.  His waiver thus applied to a proceeding that had already taken place, not, as here, to one that had yet to occur.  Moreover, the only ground on which the defendant in *Sealed Case* challenged his waiver was that his plea had not

---

[5]  Under the agreement, West reserves the right to attack his sentence collaterally under 28 U.S.C. § 2255, but only "if new and currently unavailable information becomes known to him."  RM at 7 (Plea Agreement).

been taken in accordance with Rule 11. If the plea was not valid then the plea agreement — including the waiver of the right to appeal — would not be enforceable. Once we determined that there was no Rule 11 error, the defendant offered no other reason to deny effect to the waiver with respect to the defendant's other claims.

West, for his part, offers no reason why we should not honor the waiver here. His opening brief simply raises his challenges to the sentence, without addressing the explicit waiver barring such challenges. In his reply brief, he reserves one short paragraph for a response to the government's contentions. He first asserts that the waiver is void because the entire plea agreement was the result of "fraud in the inducement," *i.e.*, because it was the product of false promises by the government regarding his sentence. Reply Br. at 8. This is merely a reprise of his argument that his plea was tainted — one we have already rejected.

West then suggests that his *Blakely* challenge falls within an exception to the waiver allowing appeal if "the Court sentences Mr. West to a period of imprisonment longer than the statutory maximum." This argument, of course, does not deny that a waiver of appeal rights is valid, but only that this particular waiver does not cover West's *Blakely* claim. If anything, this argument implicitly *acknowledges* the waiver's validity.[6]

---

[6] At oral argument, counsel argued that the waiver's exception for upward departures under § 5K2 of the Guidelines permits an appeal of the enhancements applied to West's sentence. When the court pointed out the distinction between sentencing enhancements and upward departures under the Guidelines, counsel acknowledged his mistake and conceded the point. He did not challenge the waiver's validity.

We find that we need not question the validity of West's waiver because he has not. Ordinarily, we "refuse to disturb judgments on the basis of claims not adequately briefed on appeal." *McBride v. Merrell Dow and Pharmaceuticals, Inc.*, 800 F.2d 1208, 1210 (D.C. Cir. 1986). This practice is rooted in the Federal Rules of Appellate Procedure, *see* Rule 28(a)(9)(A) (appellant's brief must contain his "contentions and reasons for them"), and is essential to our system of appellate review, *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) ("The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them."). Rulings on issues that have not been fully argued run the risk of being "improvident or ill-advised." *McBride*, 800 F.2d at 1211. There is even greater cause to be wary where, as here, the consequences of our ruling are potentially far-reaching. *See Alabama Power Co. v. Gorsuch*, 672 F.2d 1, 7 (D.C. Cir. 1982) (per curiam). A decision as to whether, and in what circumstances, waivers of appeal rights are valid could affect a large number of criminal defendants. We therefore decline to decide the issue without adequate briefing, and treat the waiver as binding on West because he has not contested it.

The upshot is that West may only appeal his sentence on a ground that falls within one of the waiver's exceptions. Because he does not argue that an exception applies either to his challenge to the district court's application of the Guidelines or to his Confrontation Clause claim, his waiver bars these claims. The lone remaining issue is whether he can fit his *Blakely* claim into the exception allowing him to appeal if "the Court sentences [him] to a period of imprisonment longer than the statutory maximum." RM at 7 (Plea Agreement). West contends that the term "statutory maximum," as used in the plea agreement, should be read as it is "defined in *Blakely*." Reply Br. at 8. If

the exception is understood in this way, West argues, his *Blakely* claim survives.

This requires some explication. The Supreme Court held in *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), that, except for the fact of a prior conviction, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." In *Apprendi*, "statutory maximum" had a relatively clear meaning: it was the maximum penalty allowed by the criminal statute that the defendant was charged with violating. *See id.* at 468–69 (judge's finding of fact raised statutory maximum from 10 to 20 years). In *Blakely* the Supreme Court applied *Apprendi* to a state sentencing guidelines scheme, and explained that, in that context, "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." *Blakely*, 124 S. Ct. at 2537.

West claims that the Sentencing Guidelines operate in the same manner as the statute struck down in *Blakely* and are therefore unconstitutional. Most important for present purposes he contends that this claim is not barred by his appeal waiver because the waiver's "statutory maximum" exception contemplates precisely this kind of *Blakely*-based challenge to the Guidelines.

The question is one of interpretation, informed by principles of contract law. *Ahn*, 231 F.3d at 35; *United States v. Jones*, 58 F.3d 688, 691 (D.C. Cir. 1995). Applying those principles, we find it implausible that at the time of the plea agreement the parties could have understood "statutory maximum" to mean "statutory maximum for *Apprendi* purposes," as West suggests. If the exception means what West

says, it could only relate to a challenge under *Apprendi*. But this court certainly did not give West any reason to believe that the exception's language would preserve an *Apprendi* attack on the Guidelines. Indeed, our decisions, like those of other circuits, consistently refused to apply *Apprendi* to the Guidelines or to interpret "statutory maximum" as West urges us now to do. *United States v. Fields*, 251 F.3d 1041, 1043 (D.C. Cir. 2001); *In re Sealed Case*, 246 F.3d 696, 698–99 (D.C. Cir. 2001) ("it is hard to see how the [Supreme Court] could have intended to mandate the heightened standard for application of the Guidelines' enhancement instructions when the resulting sentence remains within the statutory maximum").

Indeed, West himself seems to have read the exception differently before *Blakely*. In his opening brief, submitted before *Blakely* was decided, he did not raise any *Apprendi* claim at all; it was only in his reply brief — and after the Supreme Court decided *Blakely* — that he argued that the exception covered a challenge to the Guidelines. *See* RESTATEMENT (SECOND) OF CONTRACTS § 202 cmt. b (1981) ("In interpreting the words and conduct of the parties to a contract, a court seeks to put itself in the position they occupied at the time the contract was made.").

Furthermore, reading the "statutory maximum" exception as preserving an *Apprendi* attack on the Guidelines is flatly inconsistent with the rest of West's plea agreement. *See* RESTATEMENT (SECOND) OF CONTRACTS § 202(2) (1981) ("A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together."). The same section of the agreement sets out the maximum fines and periods of imprisonment for violations of 18 U.S.C. § 664 and 29 U.S.C. § 439(b). *See* RM at 6 (Plea Agreement). The most reasonable inference is that "statutory maximum" in the waiver exception refers to these. In addition, as the agreement makes clear, West

"understands that his sentence will be imposed in accordance with the United States Sentencing Guidelines . . . and that the Judge, in his sole discretion, will determine the facts relevant to sentencing under the Sentencing Guidelines." *Id.* Having consented in such plain terms to sentencing under the Guidelines, West would have us believe that he nevertheless reserved a constitutional challenge to the Guidelines through an exceedingly subtle employment of "statutory maximum." We find such a reading of the agreement untenable.

We emphasize that we decide here only the narrow issue of whether the exception to West's waiver of appeal rights allows him to attack his sentence under *Blakely* and *Apprendi*. It does not. We do not reach either the question whether such waivers are valid as a general matter — because appellant does not argue otherwise — or whether by simply pleading guilty West waived, or could have waived, his *Blakely* rights. What we do decide is that a waiver of the right to appeal a sentence will be enforced if the defendant gives us no argument why it should not be, and that this particular waiver covers all the sentencing claims West seeks to advance on appeal.

*Affirmed*.