GRIFFITH, Circuit Judge, concurring in part and dissenting in part.
The majority devotes almost all of its analysis, see Maj. Op. at 19-22, to deciding whether an agency’s budget request to Congress constitutes “final agency action” under the Administrative Procedure Act (“APA”), see 5 U.S.C. § 704. I agree fully with the majority that a budget request made by a federal agency to Congress, in and of itself, is not subject to judicial review under the APA.
The majority gives short shrift, however, to what happened after Congress appropriated the funds requested by the Bureau of Land Management (“BLM”). Through the Wild Free Roaming Horses and Burros Act (‘WHBA” or the “Act”), 16 U.S.C. § 1331, et seq., Congress has given the BLM a broad mandate: “manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands,” 16 U.S.C. § 1333(a). After completing an extensive review of its management of wild horses and burros throughout the American West, and receiving funds to pursue a new course, the BLM’s central leadership in Washington, D.C. issued “Instruction Memorandum No.2002-095” (the “Instruction Memorandum” or “Memorandum”), which sets out the agency’s final plan for the Restoration Strategy and the specific standards field employees are to use in managing wild horses through the year 2010. Specifically, the Memorandum sets forth the particular types and quantities of horses that agency employees are to remove under the BLM’s current interpretation of the WHBA.
The majority never squarely addresses whether the Instruction Memorandum constitutes final agency action, see Maj. Op. at 18-19, and instead devotes its analysis to the agency’s earlier budget request, see id. at 19-22. But at base, this case is nothing more than a rather ordinary request for review of regulatory criteria promulgated by an agency in carrying out a congressional mandate. A preliminary budget request sent to Congress surely does not constitute final agency action, but that request does not immunize from judicial review an agency’s later, final order implementing its statutory authority.
To resolve the Fund’s claim predicated upon the Memorandum, the majority raises a mootness issue sua sponte, but without providing the parties an opportunity to respond. The majority concludes that, as a matter of law, an expiration date printed on the Memorandum makes it “doubtless *24 ... [that] the Memorandum was [only] in effect for ... a short period of time,” Maj. Op. at 18 n.5, despite the BLM’s acknowledgment in its brief that it “does not dispute ... that the general national planning approach set forth in the ... Memorandum continues to serve as guidance to the field for the conduct of specific gather and removal decisions,” Appellees’ Br. at 25 n.6. In the majority’s view, it is “doubtless” that the Fund’s claim is moot even where other terms of the Memorandum purport to provide the agency’s governing 'interpretation of the Act through the year 2010.
As the Government notes in its brief, no party has developed a record on the majority’s expiration argument, see Appellees’ Br. at 25 n.6, because no party has made that argument. As we have said before: “ ‘The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and. research, but essentially as arbiters of legal questions presented and argued by the parties before them.’ ” United States v. West, 392 F.3d 450, 459 (D.C.Cir.2004) (quoting Carducci v. Regan, 714 F.2d 171, 177 (D.C.Cir.1983)). The majority runs afoul of that maxim by dismissing the Fund’s claim on mootness grounds absent any development of that issue by the parties.
Undoubtedly, even where “no party asserts that the case is ... moot, we are obliged to address the issue sua sponte because mootness goes to the jurisdiction of this court.” Mine Reclamation Corp. v. FERC, 30 F.3d 1519, 1522 (D.C.Cir.1994) (citing Iron Arrow Honor Soc’y v. Heckler, 464 U.S. 67, 70, 104 S.Ct. 373, 78 L.Ed.2d 58 (1983) (per curiam)). With respect to fact-dependant jurisdictional issues, however, “it is our general practice to allow full development and presentation, in the district court of matters that surface initially on appeal” and “[w]e ... therefore remand ... to the district court for a current ruling on whether ... threshold Article III requirements are satisfied.” Women’s Equity Action League v. Bell, 743 F.2d 42, 44 (D.C.Cir.1984) (citing Dan-dridge v. Williams, 397 U.S. 471, 475-76 n. 6, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970)) (internal citation omitted).
By not following that general practice of allowing the parties to fairly join this issue, the majority ends this case on mootness grounds despite the BLM’s concession that the “general national planning approach set forth in the February 2002[M]emorandum continues to serve as guidance to the field,” Appellees’ Br. at 25 n.6, and that the Restoration Strategy, which the Instruction Memorandum by its terms implements, see Joint Appendix (“JA”) at 113, 118, is “intended ... to provide guidance for the national wild horse and burro program for some unspecified period of time,” Appellees’ Br. at 28 (emphasis added). The Instruction Memorandum was doubtless in effect when the parties briefed summary judgment in the District Court. The BLM represents in its brief, however, that its Instruction Memoranda are “reviewed annually.” Id. at 25. That annual reviewing process, combined with the fact that the agency acknowledges that it still follows the approach set forth in the Memorandum, suggests that either this - Memorandum is still in effect or the agency has issued another memorandum setting forth the same, continuing legal interpretation of the WHBA. The parties will have no chance to develop that issue, however, because the majority has declined to allow the parties an opportunity to develop a record on mootness.
The majority, citing to the summary judgment standard, concludes that there is no “genuine issue of material fact” regarding whether the Memorandum is moot. *25 See Maj. Op. at 19- & n. 6. At summary judgment,. however, we are to “view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor.” Mastro v. Potomac Elec. Power Co., 447 F.3d 843, 850 (D.C.Cir.2006) (citing Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). There appears to be “evidence” that the “expiration date does not mean what is says,” Maj. Op. at 19 n. 6 (quotation marks omitted), where, as discussed below, the Memorandum by its terms provides instructions to BLM field employees for the years 2006, 2007, 2008, 2009, and 2010-years that are hardly moot — and where the BLM acknowledges that the Strategy, which the Memorandum sets forth, was “intended ... to provide guidance for the national wild horse and burro program for some unspecified period of time.” Appel-lees’ Br. at 28.
But the majority’s “no evidence” argument is a red herring. Even if the majority were correct on that score, it would hardly be surprising that a record would be incomplete on an issue never raised or challenged by any party. Although it is true that “the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment,” that is only so “as long as the plaintiff has had a full opportunity to conduct discovery.” Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); see, e.g., Khan v. Parsons Global Servs., Ltd., 428 F.3d 1079, 1087 (D.C.Cir.2Q05) (this “court has long recognized that a party opposing summary judgment needs a ‘reasonable opportunity’ to complete discovery before responding to a summary judgment motion and that ‘insufficient time or opportunity to engage in discovery’ is cause to defer decision on the motion”) (quoting Martin v. Malhoyt, 830 F.2d 237, 256 (D.C.Cir.1987)). The majority’s sua sponte grant of summary judgment for “[t]he absence of record evidence,” Maj. Op. at 19 n. 6, is particularly problematic because it comes on appeal, with the Fund having had no notice of the majority’s argument or possibility of seeking discovery or introducing evidence in response. See Ramirez de Arellano v. Weinberger, 745 F.2d 1500, 1537 & n. 163 (D.C.Cir.1984) (en banc) (“Unless the new issue uncovered by the appellate court was one which was clearly framed by the proceedings below so that the parties had a legitimate chance to submit all relevant materials and argue their implications, it is clearly unjust for the appellate court to direct the issuance of summary judgment on a new issue raised sua sponte on appeal.”) (collecting citations), vacated on other grounds, 471 U.S. 1113, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985).
The very legal authority relied upon by the majority shows where the majority errs. Contrary to the majority’s suggestion, it is the BLM — and not the Fund— that bears the burden, at this stage, of demonstrating that the Agency has abandoned the course set forth in the Memorandum. See Maj. Op. at 18-19 (relying upon Worth v. Jackson, 451 F.3d 854, 860 (D.C.Cir.2006); In re Bluewater Network, 234 F.3d 1305, 1314 (D.C.Cir.2000)). As we recently noted in Worth:
“it is well settled that a defendant’s voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice” except when the defendant meets its “heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again.”
451 F.3d at 860 (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 189, 120 S.Ct. 693, 145 *26 L.Ed.2d 610 (2000) (alterations omitted)) (quotation marks and alteration omitted). True, as the majority suggests, an agency can abandon its own guidance and no longer follow a memorandum with an expiration date. But the record does not establish, at this stage, that the Instruction Memorandum has been withdrawn. The BLM has not attempted to meet its “heavy burden,” see Laidlaw, 528 U.S. at 189, 120 S.Ct. 693, of persuading this Court that it will not continue to follow the Instruction Memorandum — because it concedes, contrary to the majority’s suggestion, that it does continue to follow “the general national planning approach set forth in the ... [Memorandum.” Appellees’ Br. at 25 n.6. If given a chance to develop the majority’s mootness issue in the District Court, the BLM would be able to advise on which parts of the Instruction Memorandum it follows, and the Fund would be able to address, and develop a record on, whether any recent BLM Instruction Memoranda evidence that the BLM continues to follow the same approach the Fund challenges. But despite the substantial resources invested in this litigation, and despite our general approach of remanding such fact-intensive Article III issues that have gone previously unchallenged, this case ends today without any of the parties having been given a chance to address mootness. Instead, the parties are left with one paragraph from the majority asserting mootness, see Maj. Op. at 18-19, and the BLM is not held to meeting its “heavy burden,” see Laidlaw, 528 U.S. at 189, 120 S.Ct. 693, of demonstrating that the Fund’s claim is moot.
Given the BLM’s acknowledgment that it still follows the “general national planning approach” set forth in the Memorandum, Appellees’ Br. at 25 n.6, it is clear, however, that this approach — whether distributed to field employees through the Instruction Memorandum or a version of the Memorandum'with a new expiration date — constitutes “final agency action” under the precedent of both the Supreme Court and this Circuit, see 5 U.S.C. § 704. As the Supreme Court has reminded us, “[t]he particular label placed upon [an agency order] by [an agency] is not necessarily conclusive, for it is the substance of what the [agency] has purported to do and has done which is decisive.” Columbia Broad. Sys. v. United States, 316 U.S. 407, 416, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942); see also, e.g., CropLife Am. v. EPA, 329 F.3d 876, 883 (D.C.Cir.2003) (same); General Elec. Co. v. EPA 290 F.3d 377, 383-85 (D.C.Cir.2002) (same); Envtl. Def. Fund v. Gorsuch, 713 F.2d 802, 816 (D.C.Cir.1983) (same); Chamber of Commerce of U.S. v. OSHA 636 F.2d 464, 468 (D.C.Cir.1980) (same).
“Our cases ... make clear that an agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding.” General Elec., 290 F.3d at 383 (internal citations omitted) (citing Appalachian Power Co. v. EPA, 208 F.3d 1015, 1023 (D.C.Cir.2000); McLouth Steel Prods. Corp. v. Thomas, 838 F.2d 1317, 1321 (D.C.Cir.1988)). As the BLM’s concession indicates, the latter is certainly present here: BLM employees in the field still must follow this agency directive. Even with respect to the first category, the Instruction Memorandum the majority holds has been withdrawn appears on its face to still be binding, or there is at least a question of fact to be resolved on that score. Although given scant attention by the majority opinion, the text of the Memorandum provides:
UNITED STATES DEPARTMENT OF THE INTERIOR BUREAU OF LAND MANAGEMENT WASHINGTON, D.C.20240
Instruction Memorandum No.2002-095
*27 Expires: 09/30/2003
To: All Field Officials (except Alaska)
From: Assistant Director, Renewable Resources and Planning
Subject: Gather Policy & Selective Removal Criteria for Wild Horses
^ ‡ * í¡í :¡í *
To achieve and maintain [appropriate management levels (“AML”)] on all [herd management areas (“HMAs”) ] a four year gather cycle will be followed for each HMA.
* * # * ❖ #
[[Image here]]
Budget projections for achieving and maintaining AML were based on these removal rates. It is important that each state schedule gathers based on these removal targets as closely as possible so that the overall program will stay within budget projections____ Any changes from this schedule will have to be coordinated with WO-260 and approved by the Assistant Director for Renewable Resources and Planning (AD-200).
JA at 113-14 (emphasis added). After directing field employees to meet those “removal rates” through the year 2010 “as closely as possible,” the Instruction Memorandum proceeds to set out “selective removal requirements” that “are in effect for all wild horses to be placed into BLM’s national adoption program or long term holding facilities.” Id. at 115 (emphasis added). According to those requirements, “wild horses will be removed, from within HMAs in the following priority order:”
1. Age Class Five Years and Younger
Wild horses five years of age and younger may be removed and placed into the national adoption program.
2. Age Class Ten Years and Older
Wild horses ten years of age and older will be removed and placed into long term holding.
* * % * * *
3. Age Class Six to Nine Years
Wild horses aged six to nine years old should be removed last and only if the HMA cannot achieve AML, without their removal.
*28 Id. at 116 (emphasis added). The Memorandum provides animals will be “unadoptable” if they have “disease[s]; serious congenital or genetic defects; physical defects due to previous injuries; recent, but not life threatening injuries; or other factors that may prevent adoption.” Id. Such animals “will” be “[rjeleased in an HMA (if defects or disease would not likely compromise [the] existing herd[ ])” or, alternatively, “[destroyed if the humane destruction criteria ... are satisfied.” Id.
It serves only a limited purpose for me to address the BLM’s arguments why the Instruction Memorandum does not constitute final agency action under the APA, given that the majority disposes of this issue on its own expiration ground. The BLM argues that the Memorandum (1) does not represent “the consummation of the agency’s decisionmaking process about the gather and removal of animals from the public lands” because field officers have “further flexibility at the project-specific level” as to which specific animals within individual herds to remove, Appel-lees’ Br. at 26; (2) contains only flexible guidelines for field officers to apply in choosing which horses to remove, id. at 27-28; and (3) is merely for “internal use by BLM employees and has no binding legal force or effect,” id. at 25-26 (quotation marks omitted).
In Bennett v. Spear, the Supreme Court set forth a two-part test for determining what constitutes “final agency action” under section 704 of the APA: “[fjirst, [an] action must mark the consummation of the agency’s decisionmaking process — it must not be of a merely tentative or interlocutory nature,” 520 U.S. 154, 177-78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (quotation marks and internal citation omitted), and “second, [an] action must be one by which rights or obligations have been determined, or from which legal consequences will flow,” id. at 178, 117 S.Ct. 1154 (quotation marks omitted). The BLM’s Instruction Memorandum meets that test. The record reveals that the Memorandum was the result of a comprehensive decisionmaking process. After studying for some time the number of wild horses and burros living throughout the West, the BLM concluded in Spring 2000 that numerous areas were significantly overpopulated. Implementing the BLM’s statutory authority under the WHBA to manage overpopulation, BLM officers set out to develop the Restoration Strategy. See Maj. Op. at 16-17. In determining how to remedy overpopulation, the BLM consulted with the Wild Horse and Burro Advisory Board — a congressionally-provid-ed board of experts, see 16 U.S.C. § 1337; all of its wild horse and burro specialists; participants at two national wild horse and burro meetings; and finally the public. The Memorandum specifically indicates that “[t]his review has been completed” and that “all comments [were] considered” prior to issuing the Memorandum. JA at 118 (emphasis added).
Thus, in the BLM’s own words, agency leadership “completed,” id., the BLM’s de-cisionmaking process regarding the criteria to be used for removing wild horses and burros. True, as the agency argues before us, BLM employees in the field must now apply those criteria and remove specific animals. But decisions by individual field employees as to which individual horses to remove are not the “consummation of the agency’s decisionmaking process.” Bennett, 520 U.S. at 178, 117 S.Ct. 1154 (emphasis added). They are nothing more than a field employee’s application of the BLM’s decision.
Under the second part of the Bennett test, an agency action is not final, and thus subject to judicial review under the APA, unless it is “one by which rights or obli *29 gations have been determined, or from which legal consequences will flow.” Id. at 178, 117 S.Ct. 1154 (quotation marks omitted). Time and again, we have turned, ultimately, to the impact guidance has on an agency, see Bennett, 520 U.S. at 177-78, 117 S.Ct. 1154, a petitioner, see, e.g., Barrick Goldstrike Mines Inc. v. Browner, 215 F.3d 45, 48 (D.C.Cir.2000), or both, see Natl Ass’n of Home Builders v. U.S. Army Corps of Eng’rs, 417 F.3d 1272, 1279 (D.C.Cir.2005). Where agency guidance alters the obligations of either, we have found final agency action. The Instruction Memorandum affects both. The Memorandum requires “All Field Officials (except Alaska),” JA at 113, to adhere “as closely as possible,” id. at 114, to the number of horses it requires to be removed. It sets binding criteria for the types of wild horses that “will be removed.” Id. at 116. Indeed, in the subsequent years since the Memorandum was issued for which the record describes how many horses were removed, field employees ap-. pear to have closely adhered to the Memorandum’s directives. Id. at 82-83, 158-59. Field employees must follow that Memorandum, and members of the Fund can no longer study and view the number and types of wild horses and burros they believe lawful agency action would otherwise allow. See id. at 85, 91-92, 95, 113-16.
This case is no different from Bennett itself. There, the Supreme Court examined an opinion letter of the U.S. Fish and Wildlife Service setting forth activities that would jeopardize an endangered species and concluded it was “final agency action” because another agency, the Bureau of Reclamation, had agreed to be bound by that letter. 520 U.S. at 178, 117 S.Ct. 1154. Because the opinion letter had “direct and appreciable legal consequences,” it was final agency action subject to review under section 704 of the APA. Id. Just as in Bennett, before us now is a written “[statement [that] alter[s] the legal regime to which the action agency is subject, authorizing [an official] to take the [animal] if (but only if) [the official] complies with the prescribed conditions.” Id. The Memorandum sets forth the legal obligations of BLM field offices for fulfilling the BLM’s duties under the WHBA, requiring them to gather and remove wild horses and to do so by complying with the criteria set out in the Memorandum. It requires BLM field employees to follow the agency’s interpretation of the WHBA and has “direct and appreciable legal consequences.” Id. at 178, 117 S.Ct. 1154. Indeed, the Strategy determines how an act of Congress will govern wild horses and burros throughout the American West for the foreseeable future — what the BLM calls in its brief “some unspecified period of time.” Appellees’ Br. at 28. About the only difference between the Fish and Wildlife Service’s opinion letter authorizing the taking of fish in Bennett and the BLM’s Memorandum authorizing the taking of horses in this case is that one involved fish and the other wild horses. That cannot be a difference of any moment.
Nor does Lujan v. National Wildlife Federation, 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), counsel a contrary result. In Lujan, the Supreme Court rejected an effort by several environmental groups to challenge a broad set of BLM actions not limited to “a single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations.” Id. at 890, 110 S.Ct. 3177. In Lujan, there was no discrete program to review. Environmental groups simply took issue with all operations of the BLM conducted pursuant to one statute. The groups failed to allege “ ‘agency action’ within the meaning of [5 U.S.C.] § 702, much less a ‘final agency action’ within the meaning of [5 U.S.C.] § 704.” Id. In con-
*30 trast, appellants here do not ask the Court to review BLM activities at a general level; they ask us to determine the legality of a clearly defined, discrete agency interpretation of a statute. Unlike Lujan, this is not an attack on the day-to-day decisionmak-ing of an agency cloaked in the language of the APA; instead, it is a rather ordinary review of criteria created by an agency to carry out its statutory obligation.
Not long ago, we summarized this trend of agencies attempting to abandon notice and comment rulemaking under the APA and instead seeking to define the scope of their powers through continually-issued agency memoranda:
The phenomenon we see in this case is familiar. Congress passes a broadly worded statute. The agency follows with regulations containing broad language, open-ended phrases, ambiguous standards and the like. Then as years pass, the agency issues circulars or guidance or memoranda, explaining, interpreting, defining and often expanding the commands in the regulations. One guidance document may yield another and then another and so on. Several words in a regulation may spawn hundreds of pages of text as the agency offers more and more detail regarding what its regulations demand of regulated entities. Law is made, without notice and comment, without public participation, and without publication in the Federal Register or the Code of Federal Regulations. With the advent of the Internet, the agency does not need these official publications to ensure widespread circulation; it can inform those affected simply by posting its new guidance or memoranda or policy statement on its web site. An agency operating in this way gains a large advantage. It can issue or amend its real rules, i.e., its interpretative rules and policy statements, quickly and inexpensively without following any statutorily prescribed procedures. The agency may also think there is another advantage — immunizing its lawmaking from judicial review.
Appalachian Power, 208 F.3d at 1020 (quotation marks and internal citation omitted). The same phenomenon occurs here today. At issue is a broad congressional mandate: “manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands.” 16 U.S.C. § 1333(a). Although agencies subject to similar mandates and promulgating similar memoranda nonetheless had to face judicial review in Appalachian Power, Bennett, and numerous other cases, today the BLM’s interpretation of the Wild Free Roaming Horses and Burros Act escapes review.
Under the majority’s decision, to obtain any relief, appellants will most likely have to challenge every specific removal of horses by individual field employees. Horses can be removed from the public lands, however, faster than cases can proceed through the public’s judicial dockets. Ordinarily, litigants faced with such a dilemma would seek to apply the “capable of repetition yet evading review” exception to mootness. See Maj. Op. at 22 (quotation marks omitted). The majority concludes that this exception cannot grant appellants relief with respect to the specific removals they challenge because “[h]ow a herd will be managed in the future after the initial culling is anyone’s guess.” Id. Appellants are thus dealt a double whammy under the majority’s decision: they cannot challenge the BLM’s legal interpretation of the WHBA set forth in its Instruction Memorandum to field employees, and yet they also cannot challenge specific removals of wild horses. Under the majority’s reasoning, for a litigant seeking to challenge the lawfulness of the BLM’s actions in manag *31 ing the Nation’s wild horses and burros, “final agency action,” 5 U.S.C. § 704, can only be final in theory, but never in fact.
What the majority calls the “initial culling,” however, is set to continue through the year 2010, see Dissent at 27, pursuant to specific criteria promulgated in the Instruction Memorandum, id. at 19. According to the BLM itself, the “approach set forth in the ... Memorandum continues to serve as guidance to the field for the conduct of specific gather and removal decisions.” Appellees’ Br. at 25 n.6. I thus see no record basis for the majority’s suggestion that future removals of wild horses and burros from the public lands will not share significant — if not identical — factual and legal issues with past removals, given that field employees must continue to follow the “approach set forth” in the Memorandum. For the foregoing reasons, I respectfully dissent.