# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 13, 2015          Decided June 12, 2015

No. 13-5268

SWANSON GROUP MFG. LLC, ET AL.,
APPELLEES

v.

SALLY JEWELL, SECRETARY OF INTERIOR AND THOMAS J.
VILSACK, SECRETARY OF AGRICULTURE,
APPELLEES

KLAMATH-SISKIYOU WILDLANDS CENTER, ET AL.,
APPELLANTS

Consolidated with 14-5003, 14-5114

Appeals from the United States District Court
for the District of Columbia
(No. 1:10-cv-01843)

*Brian C. Toth*, Attorney, U.S. Department of Justice, argued the cause for appellants/cross-appellees Secretary of the Interior, et al. With him on the briefs were *Sam Hirsch*, Acting Assistant Attorney General, *David C. Shilton*, Attorney, and *Charles Spicknall*, Counsel, U.S. Department of Agriculture.

*Kristen L. Boyles* and *Susan Jane M. Brown* were on the briefs for appellants/cross-appellees Klamath-Siskiyou Wildlands Center, et al. *Patti A. Goldman* entered an appearance.

*Mark C. Rutzick* argued the cause and filed the brief for appellees/cross-appellants Swanson Group Mfg. LLC, et al.

Before: GARLAND, *Chief Judge*, ROGERS, *Circuit Judge*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: The Secretaries of the Interior and Agriculture appeal the grant of summary judgment and issuance of a mandatory injunction to sell a certain amount of timber annually from federal land managed under the Oregon and California Railroad and Coos Bay Wagon Road Grant Lands Act of 1937, 43 U.S.C. §§ 1181a *et seq.* ("O & C Act"). We must vacate the judgment and remand the case with instructions to dismiss the complaint because the plaintiffs lack standing under Article III of the U.S. Constitution. The question before this court is not whether parties such as these plaintiffs *could* have standing to bring the claims at issue but whether the evidence the plaintiffs presented in support of their standing is sufficient. For the following reasons we conclude that none of the plaintiff timber companies or timber organizations have demonstrated Article III standing.

**I.**

The Bureau of Land Management ("BLM") in the Department of the Interior manages 2.4 million acres of public land in western Oregon, most of which is governed by the O & C Act. In 1916, Congress instructed the Secretary of the

Interior to sell the timber from this land "as rapidly as reasonable prices can be secured therefor in a normal market." Act of June 9, 1916, Pub. L. No. 64–86, § 4, 39 Stat. 218, 220; *see also* Act of Feb. 26, 1919, Pub. L. No. 65–280, § 3, 40 Stat. 1179, 1180.  In 1937, Congress changed course, providing that O & C timberland

> shall be managed . . . for permanent forest production, and the timber thereon shall be sold, cut, and removed in conformity with the principal [sic] of sustained yield for the purpose of providing a permanent source of timber supply, protecting watersheds, regulating stream flow, and contributing to the economic stability of local communities and industries, and providing recreational facilties [sic].

43 U.S.C. § 1181a.  The O & C Act requires that "[t]he annual productive capacity for such lands shall be determined and declared as promptly as possible."  *Id.*  It also instructs the Secretary of the Interior that "timber from said lands in an amount not less than . . . the annual sustained yield capacity . . . shall be sold annually, or so much thereof as can be sold at reasonable prices on a normal market."  *Id.*

At issue are timber sales from O & C Act lands in the Roseburg and Medford districts of western Oregon from fiscal years 2004 to 2010.  BLM's 1995 resource management plans establish "allowable sale quantities" of timber, which BLM treats as synonymous with the statutory term "annual productive capacity," *see* IV BLM, Final Environmental Impact Statement for the Revision of the Resource Management Plans of the Western Oregon Bureau of Land Management app. R, at 712 (2008).  The allowable sale quantity for Roseburg is 45 million board feet; for Medford, 57.1 million board feet.  The Roseburg and Medford plans provide that "[t]he actual sustainable timber

sale level . . . may deviate by as much as 20 percent from the identified allowable sale quantity." BLM, Roseburg District: Record of Decision and Resource Management Plan 61 (1995); *accord* BLM, Record of Decision for the Medford District Resource Management Plan 72 (1995). Between fiscal years 2004 and 2010, the timber sold from the Roseburg district was only 43% of the allowable sale quantity, averaging 19 million board feet per year; the timber sold from the Medford district was only 56% of the allowable sale quantity, averaging 32 million board feet per year. The amount of Roseburg timber sold was less than 80% of the allowable sale quantity every year; the amount of Medford timber sold reached 80% of the allowable sale quantity in only fiscal years 2005 and 2006.

In 2010, two timber companies and three timber organizations (together, "the companies") sued for declaratory and injunctive relief to remedy alleged statutory violations by the Secretaries of the Interior and Agriculture in connection with timber sales in Oregon and Washington. The companies alleged that from fiscal years 2004 to 2010, the Secretary of the Interior failed to sell the amount of timber required by the O & C Act in Roseburg and Medford. As relevant, they sought a declaration under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 706(1)–(2), that BLM's failure annually to offer for sale 80% of the allowable sale quantity of timber from Roseburg and Medford violated the O & C Act, and an order compelling BLM annually to offer for sale 80% of the allowable sale quantity of timber and additional timber in fiscal years 2011 and 2012 to make up for past shortfalls. In addition, the companies alleged that the Owl Estimation Methodology, used in planning federal timber sales to ensure compliance with the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*, *see* Methodology for Estimating the Number of Northern Spotted Owls Affected by Proposed Federal Actions 2 (2008) ("OEM"), was invalid for

lack of notice and opportunity for comment under the APA.

The parties filed cross motions for summary judgment. On June 26, 2013, the district court granted summary judgment to the companies on their O & C Act claim and permanently enjoined BLM "to sell or offer for sale the declared annual sustained yield capacity of timber for the Medford and Roseburg districts for each future year, in accordance with the O & C Act." *Swanson Grp. Mfg. LLC v. Salazar*, 951 F. Supp. 2d 75, 84 (D.D.C. 2013). The court also vacated the OEM for lack of notice and comment, *id.* at 88, and dismissed the companies' remaining claims, *id.* at 76. On July 25, 2013, the district court granted the companies' unopposed emergency motion to make the OEM vacatur prospective only. By order of November 5, 2013, the district court denied the Secretaries' request for clarification regarding the legality of continued reliance on OEM source documents. By minute orders of December 20, 2013, the court denied the companies' post-judgment requests for further relief compelling BLM to offer additional timber sales in fiscal years 2014 and 2015 equal to the volume BLM fell short in fiscal years 2004 through 2013; on April 25, 2014, the court denied reconsideration of the denial of further relief. The Secretaries appeal the grant of summary judgment and the denial of clarification; the companies cross appeal the denials of further relief and reconsideration. Our review of the grant of summary judgment is *de novo*. *Defenders of Wildlife v. Gutierrez*, 532 F.3d 913, 918 (D.C. Cir. 2008).

## II.

Our analysis begins and ends with consideration of our jurisdiction. The Secretaries challenged the companies' standing under Article III of the Constitution to bring both the O & C Act and APA claims in the district court. In granting summary judgment, the district court ruled, without explanation,

that the companies have standing. *Swanson Grp. Mfg.*, 951 F. Supp. 2d at 81 n.8. The Secretaries renew their standing objection on appeal.

"Article III of the Constitution confines the jurisdiction of the federal courts to actual 'Cases' and 'Controversies,' and . . . 'the doctrine of standing serves to identify those disputes which are appropriately resolved through the judicial process.'" *Clinton v. City of New York*, 524 U.S. 417, 429 (1998) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). As plaintiffs, the companies bear the burden of demonstrating they have standing to pursue their claims. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "[T]he irreducible constitutional minimum of standing" requires "[1] an injury in fact . . . which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical, . . . [2] a causal connection between the injury and the conduct complained of . . . , [and] [3] it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 560–61 (footnote, citations, and internal quotation marks omitted). At the summary judgment stage of the proceedings, the companies "can no longer rest on . . . 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' which for purposes of the summary judgment motion will be taken to be true." *Id.* at 561 (citations omitted). Statements of fact must be sufficiently specific to rise above the level of "conclusory allegations." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Although "general factual allegations of injury resulting from the defendant's conduct may suffice" to show standing at the motion to dismiss stage, *Lujan v. Defenders of Wildlife*, 504 U.S. at 561, at summary judgment a court will not "'presume' the missing facts" necessary to establish an element of standing, *Nat'l Wildlife Fed'n*, 497 U.S. at 889.

Furthermore, because the companies seek injunctive relief, they must show an imminent future injury. *See Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011). This creates "'a significantly more rigorous burden to establish standing'" than that on parties seeking redress for past injuries. *Chamber of Commerce v. EPA*, 642 F.3d 192, 200 (D.C. Cir. 2011) (quoting *United Transp. Union v. ICC*, 891 F.2d 908, 913 (D.C. Cir. 1989)). That is, "to 'shift[ ] injury from conjectural to imminent,' the [companies] must show that there is a 'substantial . . . probability' of injury." *Id.* (first alteration in original) (quoting *Sherley v. Sebelius*, 610 F.3d 69, 74 (D.C. Cir. 2010)) (internal quotation marks omitted).

**A.**

The companies maintain they have shown "five forms of injury" resulting from BLM's failure to sell 80% of the allowable sale quantity of timber from Roseburg and Medford: "threat of mill closure; lost profit; lost opportunity to earn additional profit; reduced profit due to higher log prices; and environmental injury to landowners." Appellees' Opp'n Br. & Principal Br. Supp. Cross-Appeal 15 ("Appellees' Br."). They rely both on declarations submitted in support of their motion for summary judgment and on two declarations filed after the district court granted summary judgment on June 26, 2013. There are two problems with their position.

**1.** In determining whether the companies have standing, the court may not consider on appeal supplemental declarations filed after entry of the judgment appealed. In *Summers v. Earth Island Institute*, 555 U.S. 488, 495 n.\* (2009), the Supreme Court stated that "[i]f respondents had not met the challenge to their standing at the time of judgment, they could not remedy the defect retroactively." This court and our sister circuits generally have held that declarations that were not part of the record before the district court at the time of a judgment or order are

not part of the record on appeal of that judgment or order. *See United States v. West*, 392 F.3d 450, 455 n.2 (D.C. Cir. 2004) (citing FED. R. APP. P. 10(a) and *Kirshner v. Uniden Corp. of Am.*, 842 F.2d 1074, 1077 (9th Cir. 1988)); *Barry v. Barry*, 78 F.3d 375, 379 (8th Cir. 1996); *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1035–36 (D.C. Cir. 1988); *Paramount Film Distrib. Corp. v. Civic Ctr. Theatre, Inc.*, 333 F.2d 358, 360 (10th Cir. 1964); 16A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3956.1, at 629 (4th ed. 2008). Although this court allows parties to introduce new evidence of their standing in administrative appeals that begin in the circuit, that practice rests on the fact that there is no need for petitioners to establish Article III standing before agencies. *See Am. Library Ass'n v. FCC*, 401 F.3d 489, 493–94 (D.C. Cir. 2005); *Sierra Club v. EPA*, 292 F.3d 895, 899–900 (D.C. Cir. 2002). Here, by contrast, the Secretaries challenged the companies' Article III standing in moving to dismiss the complaint and for summary judgment. The companies neither suggest they did not have a full opportunity to make a record of their standing in the district court nor that the district court's denial of dismissal based on the allegations in the complaint deprived them of notice that additional evidence was necessary to support summary judgment, *see Nat'l Wildlife Fed'n*, 497 U.S. at 888–89; *Lujan v. Defenders of Wildlife*, 504 U.S. at 561.

After the district court granted them summary judgment, the companies filed several post-judgment motions. First, they moved that the OEM vacatur be prospective only, attaching a new declaration from Thomas L. Partin, the president of plaintiff American Forest Resource Council; the district court granted the unopposed motion. Second, the companies moved for additional relief on their O & C Act claim and for leave to file a second amended and supplemental complaint, attaching a new declaration from Steven D. Swanson, the president of Swanson Group, Inc., the managing member of plaintiff Swanson Group

Mfg. LLC ("Swanson"); the companies later requested this motion be withdrawn. In a subsequent motion for additional relief, the companies relied on these new declarations. The district court denied both motions for additional relief by minute orders, and the companies have cross appealed the denial of the later motion. Although Partin's new declaration was before the district court when it revised the grant of summary judgment relief as to the OEM vacatur, that declaration does not cure the inadequacies in the companies' showing of standing, as we discuss below. Steven Swanson's new declaration, which was filed after the court revised the OEM vacatur, was relied on in a motion seeking further injunctive relief that expressly disclaimed an intent to seek reconsideration, and the court in fact did not reconsider summary judgment, so his new declaration is not part of the record on appeal of the grant of summary judgment. *See Summers*, 555 U.S. at 495 n.\*.

The companies read *Summers* only to prevent the submission of additional evidence in support of standing after a notice of appeal has been filed. Although the Court referenced that a notice of appeal had been filed, 555 U.S. at 495 n.\*, 500, the companies' reading of *Summers* is not reconcilable with either with the Supreme Court's instruction that parties must establish standing "*at the time of judgment*," *id.* at 495 n.\* (emphasis added), or this court's conclusion in *Frito-Lay*, 863 F.2d at 1035–36, that "the obligation of this Court is to look at the record before the District Court at the time it granted the motion [for summary judgment], not at some later point." *See also West*, 392 F.3d at 455 n.2. The filing of a notice of appeal has little bearing on the purpose to allow "the trial forum vested with authority to determine questions of fact" the opportunity to evaluate "all the evidence [the parties] believe relevant to the issues," *Prime Time Int'l Co. v. Vilsack,* 599 F.3d 678, 686 (D.C. Cir. 2010) (quoting *Hormel v. Helvering*, 312 U.S. 552, 556 (1941)); *see United States v. Bonds*, 12 F.3d 540, 552–53

(6th Cir. 1993); 16A WRIGHT ET AL. § 3956.1, at 632.

**2.** The declarations that the companies submitted before judgment fail to establish Article III standing for any plaintiff. None of the organizational plaintiffs identify individual injured members. The declarations are speculative with respect to the claimed threat to the plaintiffs' interests and conclusory or silent with respect to their claims of causation and redressibility. By contrast, in *Mountain States Legal Foundation v. Glickman*, 92 F.3d 1228, 1232–33 (D.C. Cir. 1996), on which the companies heavily rely, the court concluded there was standing based on a declaration that identified a company's specific injuries (a mill closure and employee layoffs) resulting from federal logging cutbacks.

Rough & Ready Lumber LLC, a forest products manufacturing facility in western Oregon, comes closest to showing Article III standing. According to its president, Link Phillippi, Rough & Ready "relies on timber competitively purchased from the BLM's Medford [d]istrict and the Rogue-Siskiyou National Forest" and from private sellers. Link Phillippi Decl. ¶ 2 (Jan. 27, 2012). Phillippi avers that "[w]ithout an adequate supply of BLM timber and [U.S. Forest Service] timber, Rough & Ready *may not* be able to continue to operate its facility and keep its current work force employed." *Id.* ¶ 2 (emphasis added). This is, however, the kind of uncertain and unspecific prediction of future harm that is inadequate to establish Article III standing. For example, in *Chamber of Commerce*, the court concluded in light of its precedent that, where injury to the petitioners' members hinged on the actions of third parties, declarations that a challenged policy "*could*" or "*may*" cause injury were "insufficient to establish standing." 642 F.3d at 201–02. *See Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 175 (D.C. Cir. 2012); *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 563 F.3d 466, 478 (D.C. Cir. 2009); *see*

*also Ass'n of Flight Attendants-CWA, AFL-CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 466 n.1 (D.C. Cir. 2009); *La. Envtl. Action Network v. Browner*, 87 F.3d 1379, 1384 (D.C. Cir. 1996). Even were Rough & Ready analogous to a directly regulated party, that would not "diminish [its] burden to produce *evidence* of the imminent nature of a *specific* harm." *See Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810, 820 (D.C. Cir. 2006) (emphasis added). Phillippi's declaration supplies no details that would render his prediction of future injury — that Rough & Ready "may not be able to continue to operate its facility" as a result of BLM's actions, Phillippi Decl. ¶ 2 — more certain than those this court has concluded are "insufficient."

The only record evidence that Rough & Ready will be harmed by future shortfalls in Medford timber sales is Phillippi's averment that the company "has suffered economic loss and hardship as a result of the sharp decrease in BLM Medford [d]istrict timber sales in recent years." *Id.* ¶ 5. "Of course, past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury." *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974). The court, however, is told nothing about the nature of Rough & Ready's past injury. Phillippi's averments that harm to his company was caused by BLM's failure to sell enough timber in Medford and may recur as a result of the same are "'general averments' and 'conclusory allegations'" that are "inadequate" to demonstrate standing, *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 184 (2000) (quoting *Nat'l Wildlife Fed'n*, 497 U.S. at 888). By contrast, in *Mountain States*, the owner of plaintiff Owens & Hurst Lumber Company averred that his mill had suffered a "temporary closing" and the "permanent lay off of over 25 workers" when past timber sales on the land failed to move forward and was then operating at reduced capacity, employing 105 rather than 130 employees, "because of the

unavailability of timber." Declaration of James L. Hurst ¶¶ 3–4, *Mountain States*, 92 F.3d 1228. Rough & Ready leaves the court to speculate as to whether BLM's actions will cause future injury on the basis of an undefined past injury rather than averring concrete past or ongoing harm connected with timber shortages from Medford.

Contrary to the companies' view, the fact that BLM cancelled a sale in Medford for which Rough & Ready was the high bidder does not demonstrate a "[t]hreat of mill closure" caused by BLM. Appellees' Br. 20–21. Phillippi avers that the cancelled sale offered approximately 50% of the timber the company would need for a year and that BLM has not offered any volume to replace it. Phillippi Decl. ¶¶ 3–4. But the companies do not challenge BLM's cancellation of that timber sale, and Phillippi never states that Rough & Ready suffered any harm, much less had to lay off employees or close its mill, as a result of the sale's cancellation. He has not averred that Rough & Ready lost the opportunity to compete for additional timber. *See Teton Historic Aviation Found. v. U.S. Dep't of Def.*, --- F.3d ---, No. 13-5039, 2015 WL 2145859, at *4 (D.C. Cir. May 8, 2015); *CC Distribs., Inc. v. United States*, 883 F.2d 146, 150 (D.C. Cir. 1989).

Neither is it self evident that the harm to Rough & Ready was caused by reduced timber sales in Medford. Phillippi does not indicate the extent of Rough & Ready's reliance on timber purchased from Medford; he avers only that his company relies on timber purchased from Medford in addition to other sources, *i.e.*, the Rogue-Siskiyou National Forest and private sellers. Moreover, the record shows that the 2008 economic decline affected the timber market as demand for housing construction declined. Without information about Rough & Ready's past injury, Phillippi's declaration does not show Rough & Ready's economic losses "fairly can be traced" to BLM's failure to

comply with the annual sales provision of the O & C Act, *see Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41 (1976), rather than to an independent source, such as the recession. *See Delta Constr. Co. v. EPA*, 783 F.3d 1291, 1296–97 (D.C. Cir. 2015); *cf. T & S Products, Inc. v. U.S. Postal Serv.*, 68 F.3d 510, 513–14 (D.C. Cir. 1995). The Partin declaration supporting a prospective OEM vacatur is no further help; although Partin states that Rough & Ready went out of business in April 2013, he says nothing about the cause. The companies' objection that the Secretaries "submitted no evidence showing all economic losses to manufacturers since 2004 are due to poor market conditions rather than inadequate BLM timber sales," Appellees' Br. 29, misses the point; it is the companies' burden as plaintiffs to show an injury in fact fairly traceable to the challenged conduct and redressible by the court. *Lujan v. Defenders of Wildlife*, 504 U.S. at 561.

Additionally, Phillippi's acknowledgment that timber in Medford sold under the O & C Act is not the company's sole source of supply and the evidence of generally declining timber sales and demand for timber products in western Oregon underscore that Phillippi's conclusory statements fail to show that an order compelling BLM to sell 80% of the allowable sale quantity of timber from Medford would redress Rough & Ready's injury. Even with increased timber sales in Medford, Rough & Ready still may not be able to purchase enough timber or sell enough of its product to operate. *See Delta Constr. Co.*, 783 F.3d at 1296–97; *T & S Products*, 68 F.3d at 514.

None of the other companies have proffered evidence of injury resulting from the failure of the Secretary of the Interior to sell 80% of the allowable sale quantity of timber from Roseburg and Medford. Steven Swanson's first declaration, in support of summary judgment, points to no injury fairly traceable to BLM's conduct. Although averring that Swanson

has been operating at reduced capacity, his declaration is ambiguous as to whether this injury has been caused by timber shortfalls or other "market conditions," such as reduced demand for timber products during the recent economic recession. Swanson Decl. ¶ 2 (Jan. 30, 2012). He never avers that Swanson's past, present, or anticipated future supply of timber was, is, or will be inadequate. Nor does he aver Swanson is dependent on timber from Roseburg and Medford; rather, he identifies a number of other sources of timber supply and does not aver that these sources have not or will not meet the company's needs.

The other plaintiffs — the Washington Contract Loggers Association, Inc., the American Forest Resource Council, and Douglas Timber Operators, Inc. — fail to demonstrate organizational standing based on the standing of any member. *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). Although the Council and Douglas Timber identify member companies, they fail to aver that these members have been injured by BLM's actions. Instead, the declaration on behalf of Douglas Timber states only that "[t]he combined shortfall from Roseburg and Medford could have supplied" three of its named members "for more than three years." Bob Ragon Decl. ¶ 6 (Jan. 24, 2012). This is not the same as evidence identifying members that have "suffered the requisite harm" from the timber shortfalls on O & C Act land. *See Summers*, 555 U.S. at 499; *Chamber of Commerce*, 642 F.3d at 199. The declaration does not even state that these member companies fell short of supply or suffered any other concrete injury. Under the companies' view, standing is established because the timber organizations' members are the primary purchasers of timber from O & C Act land, and the industry is dependent on that timber. That is tantamount to suggesting that the organizations' standing is self evident. *See Sierra Club*, 292 F.3d at 899–900. But a statistical probability of injury to an unnamed member is

insufficient to confer standing on the organizations. *See Summers*, 555 U.S. at 498–99; *Am. Chemistry Council*, 468 F.3d at 821.

Absent a showing that any plaintiff has Article III standing to challenge BLM's failure to sell 80% of the allowable sale quantity of timber from Roseburg and Medford in fiscal years 2004 through 2010, the court lacks jurisdiction to consider the companies' O & C Act claim.

**B.**

The same defects in the companies' showing of Article III standing to bring their O & C Act challenge carry over to their procedural challenge to the OEM. Although a party alleging a procedural injury is not required to "meet[] all the normal standards for redressability and immediacy," *Lujan v. Defenders of Wildlife*, 504 U.S. at 572 n.7, at least one of the companies "must still demonstrate a causal connection between the [OEM] and the alleged injury" to itself or one of its members, *see City of Dania Beach, Fla. v. FAA*, 485 F.3d 1181, 1186 (D.C. Cir. 2007); *see also Summers*, 555 U.S. at 496; *WildEarth Guardians v. Jewell*, 738 F.3d 298, 306 (D.C. Cir. 2013).

The declarations from Rough & Ready and Swanson state that BLM is using the OEM to exclude O & C Act lands from federal timber sales. The declarations from the timber organizations aver that their members have been similarly injured with respect to other federal timberland. Neither Rough & Ready nor Swanson has demonstrated an ongoing or substantially likely future injury resulting from shortfalls in timber sales from O & C Act lands, and the organizations fail to identify any member injured by those or other federal timber shortfalls. Even if the companies had proffered sufficient evidence of past injury, they have not shown the OEM will cause such injury to them to recur.

The OEM is used by BLM, the Fish and Wildlife Service ("FWS"), and the Forest Service in planning timber sales on federal land in order to ensure compliance with the ESA. Under the ESA, a federal agency must avoid unlawful "takings" of endangered species by conducting a Biological Assessment and consulting with FWS before acting in an area where an endangered species is present. 16 U.S.C. §§ 1536(a)(2), (c)(1). Where agency action approved by FWS is likely to result in "takings," FWS issues an Incidental Take Statement, along with a Biological Opinion, that "specifies the impact" of the incidental take on the species and sets out the "reasonable and prudent measures" the Secretary of the Interior deems "necessary or appropriate" to minimize that impact as well as "terms and conditions" for the proposed action to proceed. *Id.* § 1536(b)(4); *accord* 50 C.F.R. § 402.14(i)(1). In 1990, FWS listed the northern spotted owl as a threatened species pursuant to the ESA. 50 C.F.R. § 17.11(h). The OEM quantifies the incidental take of the northern spotted owl for purposes of conducting Biological Assessments and developing and implementing Incidental Take Statements.

The companies maintain that BLM has excluded land from ESA consultation when the OEM indicates that a timber sale may result in "take" of northern spotted owls. According to Rough & Ready's president, the OEM thereby prevents BLM from planning timber sales on "thousands of acres of land." Phillippi Decl. ¶ 6. Specifically, Phillippi states that "consultation filters" imposed on BLM by FWS in 2009 "effectively prohibit the BLM from initiating consultation on any timber sale project that results in a 'take' of a northern spotted owl under the OEM." *Id.* BLM planning documents of May 6, 2011, indicate that use of the OEM to predict impacts on the northern spotted owl, in conjunction with the guidance from FWS, *see* FWS Guidance to the BLM: Interim Review Standards for Habitat Modification Projects That Would Affect

the Northern Spotted Owl or It's Critical Habitat (Aug. 6, 2009), would result in the withdrawal of a considerable portion of land in Medford from timber sale planning. FWS issued its guidance as an interim measure while it was revising its recovery plan for the northern spotted owl. The revised recovery plan was published on July 1, 2011. *See* 76 Fed. Reg. 38,575 (July 1, 2011). Nothing in the record indicates that BLM continues to follow the interim guidance to exclude land from timber sale planning whenever the OEM indicates a "take" will occur. That the companies may have suffered a past injury caused by the OEM does not confer standing for the forward-looking relief they now seek. *See Dearth*, 641 F.3d at 501.

The companies' declarations do not state that the OEM otherwise has been used to reduce timber offered for sale that the companies would purchase. They neither challenge nor reference the impact of the OEM on any particular Biological Assessment, Biological Opinion, or Incidental Take Statement relating to timber sales, despite including dozens of such documents using the OEM in the record. Absent evidence that the only injury allegedly caused by the OEM will continue in the future, the companies lack standing to pursue their procedural claim.

Accordingly, because the companies fail to demonstrate Article III standing to pursue their O & C Act and OEM claims, the court lacks jurisdiction, and we dismiss the appeals and vacate the judgment of the district court and remand with instructions to the district court to dismiss the complaint.