# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 15, 2016       Decided April 11, 2017

No. 15-5304

CARPENTERS INDUSTRIAL COUNCIL, ET AL.,
APPELLANTS

LEWIS COUNTY, A MUNICIPAL CORPORATION OF THE STATE OF
WASHINGTON, ET AL.,
APPELLANTS

v.

RYAN ZINKE AND JAMES KURTH,
APPELLEES

———

Consolidated with 15-5334

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:13-cv-00361)

———

*Mark C. Rutzick* argued the cause and filed the briefs for appellants Carpenters Industrial Council, et al.

*Susan Elizabeth Drummond* argued the cause for appellants Lewis County, et al. With her on the briefs was *Ryan A. Smith.*

*Michael T. Gray*, Attorney, U.S. Department of Justice, argued the cause for appellees.  With him on the brief was *John C. Cruden*, Assistant Attorney General.  *Brian C. Toth*, Attorney, entered an appearance.

Before: GRIFFITH, KAVANAUGH, and SRINIVASAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH.

KAVANAUGH, *Circuit Judge*:  When the Government adopts a rule that makes it more difficult to harvest timber from certain forest lands, lumber companies that obtain timber from those forest lands may lose a source of timber supply and suffer economic harm.  In recent years, that phenomenon has occurred in the Pacific Northwest.  In this case, a lumber industry group has contested one such government action.

In 2012, the U.S. Fish and Wildlife Service issued a Final Rule designating 9.5 million acres of federal forest lands in California, Oregon, and Washington as critical habitat for the northern spotted owl.  To put the agency's action in perspective, the designated critical habitat area is roughly twice the size of the State of New Jersey.  For Easterners, imagine driving all the way up and then all the way back down the New Jersey Turnpike, and you will get a rough sense of the scope of the critical habitat designation here.  The critical habitat designation means that a huge swath of forest lands in the Pacific Northwest will be substantially off-limits for timber harvesting.

Various lumber companies that obtain timber from those forest lands are members of a trade association known as the American Forest Resource Council.  The Council sued the U.S.

Fish and Wildlife Service to challenge the legality of the critical habitat designation.

The threshold question is whether the Council has standing to challenge the critical habitat designation on behalf of its members. The District Court ruled that the Council lacked standing. We disagree. The Council has demonstrated a substantial probability that the critical habitat designation will cause a decrease in the supply of timber from the designated forest lands, that Council members obtain their timber from those forest lands, and that Council members will suffer economic harm as a result of the decrease in the timber supply from those forest lands. Therefore, in light of our decision in *Mountain States Legal Foundation v. Glickman*, 92 F.3d 1228 (D.C. Cir. 1996), we conclude that the Council has standing. We reverse the judgment of the District Court and remand the case for further proceedings.

I

In 1973, Congress passed and President Nixon signed the Endangered Species Act. The Act seeks to conserve animal species that are at risk of extinction. *See* 16 U.S.C. § 1531 *et seq*. The Act authorizes the Secretary of the Interior to list species that are endangered or threatened, and to protect those species' habitats and ecosystems. *See id.* § 1533. An agency within the Department of the Interior – the Fish and Wildlife Service – helps implement the Act and is responsible for listing species as endangered or threatened.

When the Fish and Wildlife Service lists a species as endangered or threatened, it must also "designate any habitat" of the species "which is then considered to be critical habitat." *Id.* § 1533(a)(3)(A)(i). The Act defines "critical habitat" to include the "specific areas within the geographical area

occupied by the species, at the time it is listed" or the "specific areas outside the geographical area occupied by the species at the time it is listed" if such areas are determined to be "essential for the conservation of the species." *Id.* § 1532(5)(A)(i)-(ii).

Designation of land as critical habitat triggers certain consulting requirements under Section 7 of the Act. Any federal agency seeking to authorize, fund, or carry out an action on designated land must first consult with the Service to ensure that the action is "not likely to . . . result in the destruction or adverse modification" of critical habitat. *Id.* § 1536(a)(2).

The northern spotted owl is listed as a threatened species by the Fish and Wildlife Service. In 2012, the Service issued a Final Rule designating more than 9.5 million acres of federal forest lands in California, Oregon, and Washington as critical habitat for the northern spotted owl. *See* Designation of Revised Critical Habitat for the Northern Spotted Owl, 77 Fed. Reg. 71,876 (Dec. 4, 2012).

Of the lands designated as critical habitat, more than three million acres are "matrix lands." Matrix lands are lands that were previously set aside by federal statute and regulation to provide a steady supply of federal timber to the local lumber-based economy. *See* Oregon and California Railroad and Coos Bay Wagon Road Grant Lands Act of 1937, 43 U.S.C. § 1181a *et seq.*; Record of Decision for Amendments to Forest Service and Bureau of Land Management Planning Documents Within the Range of the Northern Spotted Owl, at 7 (April 13, 1994); *see also* Designation of Revised Critical Habitat for the Northern Spotted Owl, 77 Fed. Reg. at 71,880 (matrix areas are lands where "timber harvest would be the goal").

The Bureau of Land Management is a federal agency within the Department of the Interior. The Bureau of Land

Management is the federal agency primarily responsible for administering and selling timber from the matrix lands. As a result of the Fish and Wildlife Service's critical habitat designation, the Bureau of Land Management and other agencies responsible for managing federal forest lands must consult with the Service to ensure that any action that they take – including approving the harvest of timber for sale from matrix lands – will not result in "adverse modification" of critical habitat. In practice, because logging affects habitat, the critical habitat designation means that certain lands that were previously available as a source of timber are unlikely to still be available. Indeed, as the Fish and Wildlife Service itself acknowledged in the Final Rule, the critical habitat designation means that timber-harvesting activity on designated lands will be limited, and that "traditional clearcutting" of timber will be disfavored. Designation of Revised Critical Habitat for the Northern Spotted Owl, 77 Fed. Reg. at 71,941.

A forest products manufacturing trade association known as the American Forest Resource Council represents lumber companies that obtain timber from those designated forest lands. On behalf of its member lumber companies, the Council sued in the U.S. District Court to challenge the legality of the critical habitat designation. The Council claimed, among other things, that the Service did not make use of the "best scientific data available" when finalizing the critical habitat designation, as required by the Endangered Species Act. 16 U.S.C. § 1533(b)(2).

To demonstrate its standing to challenge the critical habitat designation, the Council submitted a declaration from its president, Thomas Partin. In the declaration, Partin asserted that many of the Council's lumber companies depend on federal timber sold from the designated lands. Partin alleged that the critical habitat designation will decrease the supply of

federal timber from the designated lands, which in turn will cause his member companies to suffer economic harm.

Notably, the Fish and Wildlife Service did not challenge the standing of the Council (or any of the other parties) when the case was filed in the District Court. Both sides later submitted summary judgment briefs, and, again, the Service did not question the Council's standing. The Service's failure to raise a standing argument no doubt was a considered decision. The Service presumably thought it obvious at the time that the Council had standing.

While the summary judgment motions were pending, however, this Court decided *Swanson Group Manufacturing LLC v. Jewell*, 790 F.3d 235 (D.C. Cir. 2015). *Swanson* involved a challenge by a group of lumber industry plaintiffs to the Bureau of Land Management's failure to sell statutorily required amounts of timber. The Court in *Swanson* held that the plaintiffs' declarations did not establish standing because they were conclusory and failed to show that the challenged agency action would cause economic injury to the plaintiffs. *Id.* at 242-44.

Shortly after *Swanson* was decided, the District Court understandably wanted to determine whether that case affected the standing analysis in this case. The Court issued an order to the Council and the other plaintiffs to "show cause in writing" why their case "should not also be dismissed for lack of standing" based on *Swanson*. Show Cause Order at 1, *Carpenters Industrial Council v. Jewell*, 139 F. Supp. 3d 7 (D.D.C. 2015) (No. 13-cv-00361) (J.A. 106). In response, the Council cited *Mountain States Legal Foundation v. Glickman*, 92 F.3d 1228 (D.C. Cir. 1996), and *Swanson*, and argued that it had standing based on the asserted economic injuries of its member companies. The Service filed a response to the show

cause order in which it argued, for the first time, that the case should be dismissed for lack of standing.

The District Court ruled that the Council lacked standing. The District Court reasoned that the Council's allegations of economic harm were "indistinguishable from the conclusory allegations of economic harm" that the *Swanson* Court held were insufficient to support standing. *Carpenters Industrial Council*, 139 F. Supp. 3d at 12. The District Court granted summary judgment for the Service. The Council appealed. We review the District Court's standing determination de novo.

## II

The Constitution confines the jurisdiction of federal courts to "Cases" and "Controversies." U.S. CONST. art. III, § 2, cl. 1. The case-or-controversy requirement means, among other things, that a plaintiff must demonstrate standing to sue. To establish Article III standing, a plaintiff must allege (i) a "concrete and particularized" injury that is "actual or imminent"; (ii) that the injury is caused by the challenged conduct of the defendant; and (iii) that the requested relief is likely to redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation mark omitted). An organization such as the American Forest Resource Council may establish standing by showing that at least one of its members would have standing to sue in its own right. *See Sierra Club v. FERC*, 827 F.3d 59, 65 (D.C. Cir. 2016).

To establish that it had standing in this case to challenge the critical habitat designation on behalf of its member companies, the Council submitted the declaration of Council President Thomas Partin. *See* Declaration of Thomas L. Partin (J.A. 85). Partin's declaration asserts that several lumber companies are members of the Council, and that those lumber

companies obtain timber from lands now designated as critical habitat. The declaration states that the critical habitat designation will decrease the availability of the companies' source of timber supply, which in turn will cause them to suffer economic injury. The Council contends that Partin's declaration suffices to establish Article III standing. We agree.

Where, as here, a plaintiff alleges that it will suffer future economic harm as the result of a government action, the complaint and declarations must together demonstrate a substantial probability of injury-in-fact, causation, and redressability. *See Sierra Club v. Jewell*, 764 F.3d 1, 7 (D.C. Cir. 2014); *Chamber of Commerce v. EPA*, 642 F.3d 192, 200-01 (D.C. Cir. 2011). Of course, courts do not conduct separate mini-trials on injury-in-fact, causation, and redressability. Rather, courts do their best based on the complaint and declarations to assess whether the plaintiff's assertions suffice to show the elements of standing.

The Council contends that the critical habitat designation will decrease the timber supply from designated lands and thus cause its member lumber companies to suffer economic harm. Economic harm to a business clearly constitutes an injury-in-fact. And the amount is irrelevant. A dollar of economic harm is still an injury-in-fact for standing purposes. *See Czyzewski v. Jevic Holding Corp.*, No. 15-649, slip op. at 11 (U.S. 2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'"); *Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1029 (8th Cir. 2014) ("The consumers' alleged economic harm – even if only a few pennies each – is a concrete, non-speculative injury.").

Causation is the more difficult question when considering allegations of future economic harm arising from government action that decreases a business's ability to obtain a necessary

raw material.[1]  The judicial task of determining causation can be imprecise at times (and "imprecise" is probably a generous description).  Courts must make a predictive judgment about a notoriously difficult issue – causation – based merely on the complaint and declarations.  When performing that inherently imprecise task of predicting or speculating about causal effects, common sense can be a useful tool.

This case involves lumber manufacturers that directly obtain their raw material (timber) from certain forest lands.  The lumber manufacturers contend that the government action in question decreases the supply of that raw material from those forest lands.  Common sense and basic economics tell us that a business will be harmed by a government action when (i) the government action decreases the supply of a raw material from a source that the business relies on and (ii) the business cannot find a replacement without incurring additional cost.  Indeed, this Court has already articulated a clear standing rule reflecting that principle.  In *Mountain States Legal Foundation v. Glickman*, 92 F.3d 1228 (D.C. Cir. 1996), we said: "Government acts constricting a firm's supply of its main raw material clearly inflict the constitutionally necessary injury." *Id.* at 1233.  Note that "inflict" is a synonym for "cause."

We therefore can break down the standing inquiry in this kind of case into three analytical steps.  The standing inquiry boils down to whether the plaintiff has adequately demonstrated: (1) a substantial probability that the challenged government action will cause a decrease in the supply of raw material from a particular source; (2) a substantial probability

---

[1] Causation and redressability typically "overlap as two sides of a causation coin." *Dynalantic Corp. v. Department of Defense*, 115 F.3d 1012, 1017 (D.C. Cir. 1997).  After all, if a government action causes an injury, enjoining the action usually will redress that injury.

that the plaintiff manufacturer obtains raw material from that source; and (3) a substantial probability that the plaintiff will suffer some economic harm as a result of the decrease in the supply of raw material from that source. The Council has made those showings in this case.

*First*, as the complaint and Partin's declaration both assert, the Service's designation will likely cause a decrease in the supply of timber from designated forest lands. The Service's argument to the contrary belies the text, purpose, and operation of the Final Rule designating the critical habitat in this case. Not to mention, it defies basic common sense. In the Rule, the Service states that the "*primary habitat threat* to the northern spotted owl *is from commercial timber harvest*." Designation of Revised Critical Habitat for the Northern Spotted Owl, 77 Fed. Reg. 71,876, 71,986 (Dec. 4, 2012) (emphasis added). To protect the owl's habitat, the Service first recommends that the Forest Service and the Bureau of Land Management "*conserve* older forest, high-value habitat, and areas occupied by northern spotted owls." *Id.* at 71,877 (emphasis added). To that end, the critical habitat designation provides that timber-harvesting activity on designated lands should be limited, and that "traditional clearcutting" of timber will be disfavored. *Id.* at 71,941. The decrease in the timber supply is likely to be significant. After all, we are talking about an area roughly twice the size of the state of New Jersey, much of which could previously be harvested for timber but which is now substantially off-limits to logging. The text of the Rule therefore confirms what common sense suggests. A regulation that imposes restrictions on the Government's ability to offer timber from designated forest lands for harvest is substantially probable to cause a decline in the timber supply from those lands.

*Second*, Partin's declaration shows that several of the lumber companies that are Council members obtain their supply of timber from those designated forest lands. For example, in a discussion of Council member company Rough & Ready Lumber, Partin states that Rough & Ready "has always primarily relied on" timber from the designated lands to operate its mill. Partin Decl. ¶ 10. Partin similarly alleges that Council member Seneca Sawmill Company "relies heavily" on designated lands "for its timber supply." *Id.* ¶ 12. Partin asserts that yet another Council member, Trinity River Lumber Company, "purchases logs" from designated forest lands to "supply its mill." *Id.* ¶ 17.

*Third*, the Partin declaration also demonstrates that the decrease in the supply of timber from those designated lands is substantially probable to cause those lumber companies economic harm. When a company loses a source of supply of a raw material, it may not be able to find a replacement source, much less one at the same cost. Unless the company can fully replace the source of supply at zero additional cost to the company (and by zero, we mean zero), then the company has suffered an economic harm. That is Economics 101 and Standing 101. And according to Partin, that is the situation that several Council member companies face as a result of the critical habitat designation. Partin alleges that a number of Council member companies "have lost sales of their manufacturing products," and are "threatened with the future loss of such sales, due to their inability to obtain enough timber from the Forest Service and the BLM to meet the demand of their customers." *Id.* ¶ 18; *see also id.* ¶ 17 ("Trinity River is experiencing log shortages leading to economic losses, and expects to continue to do so in the future, due to restrictions imposed by" the critical habitat designation.). Further, Partin alleges that Council member Seneca Sawmill Company "cannot maintain its current production level without a steady

or increasing supply of federal timber." *Id.* ¶ 12. Partin makes similar assertions with respect to member company Rough & Ready, noting that Rough & Ready's "ultimate success will continue to depend on a reliable federal timber sale program, which is severely threatened" by the critical habitat designation. *Id.* ¶ 10. Indeed, Partin does not merely claim that the companies will have some modestly increased costs associated with finding a new source of supply. Partin asserts that "without a reliable and adequate supply" of timber from the designated lands, several of the Council's member companies "cannot continue to operate." *Id.* ¶ 5.

In short, the available evidence adequately demonstrates: (1) that the critical habitat designation is substantially probable to cause a decrease in the timber supply from designated forest lands; (2) that it is substantially probable that Council member companies – in particular, Seneca Sawmill and Rough & Ready – obtain timber from those forest lands; and (3) that the decrease of the timber supply from those forest lands is substantially probable to cause those Council member companies to suffer economic harm. Therefore, the Council has adequately demonstrated injury-in-fact (namely, the economic harm), causation, and redressability. The Council has standing to challenge the critical habitat designation on behalf of its member lumber companies.

This Court reached a similar conclusion in *Mountain States Legal Foundation v. Glickman*, 92 F.3d 1228 (D.C. Cir. 1996). In *Mountain States*, various lumber companies challenged a Forest Service land management plan that would have decreased the supply of timber from Montana's Upper Yaak Area (a much smaller area than is at issue in this case). *See id.* at 1231. The companies argued that they had standing to challenge the Forest Service plan because, by decreasing the supply of Upper Yaak timber, the plan would deprive them of

a source of timber and therefore cause them to suffer economic harm. *See id.* at 1232-33. As we noted above, in analyzing whether the companies' allegations of economic harm sufficed for standing, the *Mountain States* Court articulated a clear and commonsensical standing principle: "Government acts constricting a firm's supply of its main raw material clearly inflict the constitutionally necessary injury." *Id.* at 1233.

The *Mountain States* Court examined the declaration of lumber company owner James Hurst in light of that principle. Hurst's declaration asserted that his lumber company depended on timber from the Upper Yaak Area affected by the challenged government action. Hurst noted that a "large part" of his company's "long term operation plans" was "timber to be supplied from" the Upper Yaak Area. *See* Declaration of James L. Hurst ¶ 4, *Mountain States*, 92 F.3d 1228. Given that dependence, Hurst alleged that his company would suffer economic harm as a result of the reduction in the supply of Upper Yaak timber. *Id.* Indeed, Hurst stated that his company had already experienced "a temporary closing" and "a permanent lay off of over 25 workers" due to its inability to obtain timber from the Upper Yaak Area. *Id.*

In other words, the Hurst declaration closely resembles the Partin declaration in this case. Hurst's declaration established: (1) a substantial probability that the Forest Service's action would cause a decrease in the supply of timber from the Upper Yaak Area; (2) a substantial probability that Hurst's company obtained its timber from that source of supply; and (3) a substantial probability that Hurst's company would suffer some economic harm as a result of the decrease in the timber supply from that source.

Based on the Hurst declaration, the *Mountain States* Court concluded that "logging cutbacks in the Upper Yaak" cause

injury to the "economic well-being" of Hurst's company, "which an order reducing the cutbacks would redress." *Mountain States*, 92 F.3d at 1233. The Court held that Hurst's company had standing to challenge the Forest Service plan based on injuries to its "economic interests from curtailment of logging." *Id.* at 1232.

The decision in *Mountain States* therefore fully supports – indeed, compels – our conclusion here that the Council has sufficiently demonstrated its standing to challenge the critical habitat designation in this case.

The Service points, however, to this Court's post-*Mountain States* decision in *Swanson Group Manufacturing LLC v. Jewell*, 790 F.3d 235 (D.C. Cir. 2015). In *Swanson*, various lumber companies, including a few of the plaintiff companies in this case, challenged the Bureau of Land Management's failure to sell statutorily required amounts of timber from federal lands. *Id.* at 238-39. The companies alleged that the shortages threatened to cause them economic injury. *See id.* at 240. Analyzing the declarations that the companies offered to show their standing, the *Swanson* Court concluded that the declarations failed to establish standing because they contained only "conclusory" and "uncertain" allegations. *Id.* at 242. In particular, the *Swanson* Court concluded that the declarations failed to establish a substantial probability that the lumber companies would suffer some economic harm as a result of the decrease in the supply of timber from federal lands. *Id.* at 242-44.

In reaching that conclusion, the *Swanson* Court focused on the particular allegations contained in the declarations before it. *Cf. id.* at 238 ("The question before this court is not whether parties such as these plaintiffs *could* have standing to bring the claims at issue but whether the evidence the plaintiffs presented

in support of their standing is sufficient."). The Court pointed to the fact that the declarations did not "indicate the extent" of the companies' "reliance on timber purchased" from the lands at issue in the suit. *Id.* at 243. By contrast here, however, Partin's declaration in this case asserts that Rough & Ready Lumber "has always primarily relied" on federal timber from designated lands to operate its business and that another company, Seneca Sawmill, "relies heavily for its timber supply from federal lands in Oregon managed by the BLM and Forest Service." Partin Decl. ¶¶ 10, 12.

The *Swanson* Court also faulted the lumber companies' declarations because – unlike the declaration in *Mountain States* – they contained only "conclusory allegations" about the effect that the challenged government action would have on their businesses. *Swanson*, 790 F.3d at 242 (internal quotation marks omitted). The *Swanson* Court further noted that the declarations did not contain evidence that any of the companies' asserted injuries were attributable to "inadequate" timber supply as opposed to "an independent source, such as the recession." *Id.* at 243. Here, like the declaration in *Mountain States* but unlike the declarations in *Swanson*, the Partin declaration links the member companies' alleged economic harms – harms ranging from lost sales and diminished production to closures and layoffs – with the decrease in the supply of timber from designated lands. *See, e.g.*, Partin Decl. ¶ 10 (Rough & Ready's prior closure and layoffs "due to its inability to secure enough federal timber" from designated lands); *id.* ¶ 17 ("Trinity River is experiencing log shortages leading to economic losses . . . due to restrictions imposed by" critical habitat designation.).

In short, under our precedents, the Council has sufficiently demonstrated standing. Because we conclude that the American Forest Resource Council has standing to challenge

the critical habitat designation, we need not address whether the other plaintiffs have standing. *See Mountain States*, 92 F.3d at 1232 (If constitutional standing "can be shown for at least one plaintiff, we need not consider the standing of the other plaintiffs to raise that claim.").

\* \* \*

We conclude that the American Forest Resource Council has standing to challenge the U.S. Fish and Wildlife Service's 2012 designation of critical habitat for the northern spotted owl. We therefore reverse the judgment of the District Court and remand to the District Court for further proceedings.

*So ordered.*