RANDOLPH, Senior Circuit Judge,
dissenting:
I disagree that petitioners — the Conservation Groups — have standing under Article III of the Constitution to proceed with their petition for review.[1]
The case is about the Environmental Protection Agency’s approval of a new insecticide. The Conservation Groups claim that their members will suffer injuries because EPA allegedly neglected to follow proper procedures in approving the insecticide. The “deprivation of a procedural right without some concrete interest that is affected by the deprivation — a procedural right in vacuo — is insufficient to create Article III standing.” Summers v. Earth Island Institute, 555 U.S. 488, 496, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009); see Maj. Op. 182-83. The Conservation Groups must therefore demonstrate, among other things, that at least one of their members will suffer a concrete injury from EPA’s *190 disregard of procedural requirements. See WildEarth Guardians v. Jewell, 738 F.3d 298, 305 (D.C. Cir. 2013); Florida Audubon Soc. v. Bentsen, 94 F.3d 658, 667, 669 (D.C. Cir. 1996) (en banc). See also Maj. Op. 182, 182-83.
For the Conservation Groups to do so is “substantially more difficult” here because their members are not objects of the challenged agency action. Lujan v. Defenders of Wildlife, 504 U.S. 555, 562, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citation omitted). That their standing depends only on a future injury — they have claimed no past injury — makes the difficulty even more acute. See Swanson Grp. Mfg. LLC v. Jewell, 790 F.3d 235, 240 (D.C. Cir. 2015). The Conservation Groups thus must show a “substantial probability” that the challenged agency action will injure their members. Id. (alterations omitted). See also Cty. of Delaware, Pa. v. Dep’t of Transp., 554 F.3d 143, 147-48 (D.C. Cir. 2009).
There are two major obstacles to standing, neither of which these petitioners are able to overcome. First, the Conservation Groups have failed to show that the insecticide — “cyantraniliprole”—will harm their members relative to the status quo ante. Without that showing, the pesticide’s registration inflicts no harm. See Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 915-18 (D.C. Cir. 2015). In other words, as the majority points out, the Conservation Groups must show an “increased risk of injury.” Maj. Op. 183 (citation omitted).
Cyantraniliprole is what the Environmental Protection Agency calls a “Reduced Risk” insecticide. That designation permits expedited registration of pesticides that provide environmental benefits relative to the status quo. See 7 U.S.C. § 136a(c)(10)(B). See also EPA Pesticide Registration Manual: Chapter 2 — Registering a Pesticide Product (last accessed June 2017). In this case, after “review and consideration of all of the data provided by the 800+ studies, the determinations made by the multiple scientists involved in the project, and the outcome of the human health and ecological risk assessments,” EPA concluded that cyantraniliprole satisfied the reduced-risk criteria. See Registration of the New Active Ingredient Cyantraniliprole at 2, Docket EPA-HQ-OPP-2011-0668-0057 (Jan. 24, 2014). EPA found that the “mammalian toxicity and ecotoxicity risk profiles for eyantranili-prole” — the risks to mammals and the ecosystem — “are favorable compared to registered alternatives.” Id.
The Conservation Groups do not contest these EPA findings. They argue instead that the environmental benefits depend on cyantraniliprole replacing rather than supplementing the more harmful pesticides, and that this court should not “assume” that users of cyantraniliprole will do so. Petitioner Reply Brief 23-24. Yet this court need not assume anything. EPA found that cyantraniliprole “is expected to be an alternative to a number of insecticide classes.... ” Registration of Cyan-traniliprole at 14. That is so not only because cyantraniliprole is “one of the least toxic alternatives that would be available for citrus growers,” but also because the pesticide is “considered to be more efficacious than current registrations of more toxic compounds” for control of many pests. Id. at 13-14. Users can thus apply cyantraniliprole once and “replace multiple or repeated applications of’ more harmful pesticides. Id. at 14. Cyantraniliprole, EPA determined, would therefore reduce the “degree of risk to listed species” by substituting a less-harmful insecticide for “what EPA believes to be more toxic compounds, that, among other things, pose greater risk, to endangered species than does cyantraniliprole.” Response to Public Com *191 ments on EPA’s “Proposed Registration of the New Active Ingredient Cyantraniliprole” at 40-41, Docket EPA-HQ-OPP-2011-0668-0058 (Feb. 5, 2014). It is therefore no surprise that the Conservation Groups have provided not a single example of a listed species actually harmed by cyantraniliprole since its registration- in early 2014.
Even if one were to assume that the insecticide would prove a net detriment to listed species, the Conservation Groups encounter a second obstacle to standing. They fail to show that an injury to those listed species would harm their members,[2] We apply “even more exacting scrutiny” when the challenged goverhment action is based on the “independent acts of third parties” and where the effect of the action would not be “located at a particular site.” Florida Audubon, 94 F.3d at 667, 670 (citation omitted). In this case, the pesticide registration authorizes cyantraniliprole for multiple sites throughout the country, but the Conservation Groups have provided no evidence of the application of cyantranili-prole to any particular site.[3] Even if the Conservation Groups could point to some harm to a listed species near a cyantranili-prole-eligible crop, one could only speculate, without more, whether cyantranili-prole or a more toxic pesticide caused that harm. The Conservation Groups also cannot establish that going forward, their members will visit locations where cyan-traniliprole has been applied. This lack of geographic specificity dooms the Conservation Groups’ standing allegations. See id. at 668. See also Earth Island Institute, 555 U.S. at 495-96, 129 S.Ct. 1142.
The majority ignores these problems. It acknowledges that the Conservation Groups must show an increased risk to their members’ interests, Maj. Op. 182-83, but then fails to consider the effect of cyantraniliprole relative to the status quo ante. The majority comes closest when it says that the pesticide “offers net environmental benefits” and “provides the growers with an effective tool that has a more favorable toxicological profile compared to currently registered alternatives.” Maj. Op. 189, 189 n.ll (citation and alterations omitted). But those facts, of course, support this dissent. The Conservation Groups’ second problem — the lack of geographic specificity in its submissions — is scarcely mentioned in the majority opinion. The opinion merely notes a “geographical nexus” or “overlap”, between potential cyantraniliprole crop areas and listed species, and it then shifts to other issues. Maj. Op. 183,184-85 (citation omitted). The majority offers no analysis of how any harm to the listed species would harm the Conservation Groups’ members.
The member declarations suggest that any harm is exceedingly unlikely. Consider, for instance, the species identified in the declarations. The declarants refer to 27 species of concern. Of those 27, only 20 are actually endangered or threatened.'Eleven of those 20 are either mammals or birds, for which cyantraniliprole is classified as “practically nontoxic.” Registration of Cyantraniliprole at 10. The remaining 9 consist of 1 freshwater fish, 5 butterflies, 2 beetles, and 1 dragonfly. Yet of those 9 species, only one declarant can confirm seeing one species. For the other 8 species — which include the two species mentioned in the majority opinion, Maj. Op. 179 — the declarants’ claim that they will *192 lose the ability to view the species is far too speculative. See Defenders of Wildlife, 504 U.S. at 565, 112 S.Ct. 2130. No evidence suggests they ever had the ability.[4]
After eliminating those unseen fish and insects, and unharmed mammals and birds, we have left one butterfly — the Bay Checkerspot. To assess the potential harm to that butterfly from cyantranili-prole, the Conservation Groups and the intervening pesticide-registrants submitted expert declarations. The competing experts both attempted to compare the extent to which the Bay Checkerspot Butterfly overlapped with those areas that contained cyantraniliprole-eligible crops sometime between 2010 and 2014 — called “labeled crop” areas. See Bradley Decl. ¶ 7; Fairbrother Decl. ¶ 24 n.24. That these “labeled crop” areas need only have had cyantraniliprole-eligible crops over a five-year period renders this measurement over-inclusive, but both experts used it. The intervenor’s expert considered the critical habitat of the Bay Checkerspot and, despite the over-inelusivity of the measure, found only a 0.06 percent overlap with the labeled crops. Kern Decl. ¶ 25. The Conservation Groups’ expert, on the other hand, employed data for both the- “elemental occurrence” of the Bay Checkerspot — those areas where the butterfly has been observed — and its critical habitat, and the expert initially found approximately a 15 percent overlap on both measures. Bradley Decl. ¶ 10. Because elemental occurrence records “can be of varying accuracy,” however, the Conservation Groups’ expert “further refined” his analysis to include “just high quality records.” Bradley Decl. ¶ 11. When he did so, he found “no data” on the overlap between the Checkerspot and the labeled crops. Bradley Decl. ¶ 12.
Remember, too, that even if the Conservation Groups had demonstrated an overlap between the insecticide arid the butterfly, standing would still depend on the two showings discussed above — that cyantrani-liprole harms the butterfly relative to alternatives and that some member would witness it having done so. It requires, in other words, the following chain of events: (1) that third parties not before the court use cyantraniliprole on their crops; (2) that those unidentified crops overlap with the listed species; (8) that cyantraniliprole, against the available evidence, proves harmful to those species; and (4) that the Conservation Groups’ members are somehow adversely affected. This “lengthy chain of conjecture” renders the Conservation Groups’ standing assertions thoroughly unconvincing. Florida Audubon, 94 F.3d at 666.
Because I would dismiss the petition for review, there is no need to separately address the majority’s flawed remedy of remanding without vacating. See Natural Resources Defense Council v. E.PA., 489 F.3d 1250, 1262-64 (D.C. Cir. 2007) (Randolph, J., concurring).

. I would affirm the district court's dismissal of the Conservation Groups' complaint. See Ctr. for Biological Diversity v. United States Envtl. Prot. Agency, 106 F.Supp.3d 95, 96 (D.D.C. 2015).

. Section 1533 of Title 16 delineates the process under which species are listed as "endangered” or "threatened." The list appears at 50 C.F.R. § 17.11.

. The intervenors filed documents under seal showing cyantraniliprole’s use in certain states, but the filing does not identify particular sites.

. The majority notes that one declarant has seen “Longhorn Beetle drill holes.” Maj. Op. 183 (citation omitted). But not all Longhorn Beetles are threatened, and the declarant does not know whether the threatened variety created the holes. See Miller Decl. ¶ 12.